**PHOTON, INC., et al., Plaintiffs,**

v.

**ELTRA CORPORATION et al., Defendants.**

No. 67 C 1627.

United States District Court
N. D. Illinois, E. D.

Aug. 18, 1969.

134

Winston, Strawn, Smith & Patterson, Chicago, Ill., and Curtis, Morris & Safford, New York City, for plaintiffs.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., and Luther E. Morrison, Morrison, Kennedy & Campbell, New York City, and William P. Keegan, Brooklyn, N. Y., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

Plaintiff Photon, Inc. seeks to enforce two photocomposition patents, Caldwell 2,670,665 and Higonnet 3,332,617. Defendant Eltra Corporation (formerly Mergenthaler Linotype Company) manufactures five different devices charged

with infringement. Logan Square Typographers, Inc. uses certain accused machines at its Chicago plant. Eltra has also counterclaimed against Photon on three related patents.

Photocomposition is a relatively recent development in the type composing field. The printing of newspapers, books and other publications normally utilizes metal type. Conventional type composition has several disadvantages. The type must be set one character at a time. The metal characters and associated equipment are relatively expensive. On the other hand, photocomposition machines simply photograph the desired letters, numerals, punctuation marks, and other characters. In Photon, Inc. v. Harris-Intertype Corp., 235 F.Supp. 921, 925 (D.Mass.1964), Judge Caffrey explained that:

> "Phototypesetting eliminates the use of hot metal. In this method of printing an operator selects characters by use of a keyboard, causing a character to be projected directly on to a film by means of light rays sent through an opaque background with a transparent character. Next, a photographic negative so prepared is placed on the offset lithographic plate, which is a metal plate with a sensitized surface. It is then exposed to light and thereafter prepared to be put on the press for printing purposes, i. e., photographic typesetting by-passes the entire hot metal operation and makes available directly from the machine the photographic negative from which the lithographic plate can be made."

Consequently, photocomposition is often much less expensive than metal type composing. Moreover, since the matrixes containing the master characters may be lightweight plastic plates, a significantly larger number of type styles, such as Roman or Italic, may be readily employed. Several different grids, each containing a complete "font" of characters, may be stored in a single photographic unit and interchanged as necessary.

As with conventional type composing, hundreds of photocomposition patents have been granted, each covering a specialized aspect of the process. The Caldwell patent and the Higonnet patent consider two entirely separate problems; similarly, the solutions proposed by the respective inventors are completely independent of one another.

This opinion will first consider the Caldwell patent, then explain the Higonnet invention, and finally discuss Eltra's counterclaim. Within each section, both validity and infringement will be determined.

## I. CALDWELL PATENT

When character images are being photographically projected onto sensitized film, all photocomposition machines must somehow determine the exact film position for the character, while simultaneously spacing each character in the proper relationship to adjoining images. Prior to the Caldwell patent, the film carriage normally moved in discrete, variable steps to adjust for each successive character.

Realizing that familiar optical principles might facilitate character spacing, Professor Caldwell suggested that a lightweight lens and mirror could be shuttled back and forth in a beam of collimated light, thus allowing the film to remain stationary. Specifically, the patent teaches that light rays shining through a master matrix can be rendered self-parallel by a collimating lens. A mobile imaging lens and mirror can later reconverge the light rays and direct them to the proper position on the film.[1] The moving lens and mirror structure thus produces a "trombone" effect. In actual photocomposition, of course, the charac-

---

1. "According to the present invention the function of character spacing is performed within the optical system itself, the respective elements of which are made relatively movable. * * * The optical system is designed * * * to utilize the properties of a collimating lens." Caldwell patent, column 1, starting at line 46.

ter images are not flashed until the mirror is correctly placed.

Compared with the prior art, the use of collimated light increased the speed of photocomposition by four to five times over preceding units. Having relatively little inertia, the structure can shift positions quickly without distorting an image.[2]

■ A. *Validity.* Relying upon eight separate patents, Eltra maintains that (1) the invention was anticipated by the prior art, and (2) the claims were obvious to one ordinarily skilled in the art. As the subsequent discussion will demonstrate, none of the cited references suggests Caldwell's novel contribution— the utilization of collimated light to space characters in photocomposition.

Chireix patent 1,893,158 describes telegraph printers. The lens is stationary, rather than sliding within collimated light. The characters also have constant spacing between one another; however, in photocomposition, lines must be "justified," or adjusted so that both the left and the right margins are even. The Caldwell patent therefore allows characters to have variable distance spacing.

The two Eppenstein patents (1,544,090 and 1,589,797), the two Turrettini patents (2,368,434 and 2,474,602), and the Lindner patent 2,110,958 are substantially identical, insofar as they relate to Caldwell's invention. Each discusses devices for measuring lengths or reading a scale. The miscroscopes can be moved in a collimated beam without changing the focus of the system. But, the images are not typographical characters, the spacing of images is not considered, and none of the patents suggests how its optical system could be used in photocomposition.[3]

■ Anticipation requires that "all of the elements of the patented device or their equivalents must be found in a single prior device." Amphenol Corp. v. General Time Corp., 397 F.2d 431, 438 (7th Cir. 1968). See also Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961); Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685 (7th Cir. 1935). While several of the preceding patents employ collimated light, they do not attempt to space characters. Moreover, not a single reference relates to photocomposition. The Caldwell invention was therefore not anticipated by the prior art.

■ Next, Eltra alleges that the patent's claims were obvious. As explained by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), obviousness is analyzed in terms of the prior art as of the time the invention was conceived. See also Gass v. Montgomery Ward & Co., 387 F.2d 129, 132 (7th Cir. 1967). The prior art consisted of the foregoing patents which, as already indicated, did not teach the use of collimated light to space characters in photocomposition. Mergenthaler's experts possessed ordinary, if not extraordinary, skill in the art. Yet, when Caldwell conceived of the invention in 1949, the defendant's employees had already spent three years trying unsuccessfully to solve

2. The introductory portion of the Caldwell patent explains that:
   "A necessary function of such apparatus is to cause relative motion between the projected character images and the sensitized surface. . * * * This motion must also be performed with speed and precision commensurate with the desired accuracy in the alignment of character projections.
   " * * * The requirement of speed, particularly where the motion is intermittent, places a premium on light construction; but this objective is in conflict with the requirement of accuracy of positioning, which places a premium on sturdy construction.
   "An object of the present invention is to provide apparatus for character spacing which requires only the movement of lightweight, low-inertia elements." Column 1, starting at line 5.

3. The remaining two patents are Schroter 1,746,407 and Elliott 2,388,961. The former does not employ the trombone effect. Similarly, the latter neither uses collimated light nor utilizes a mobile imaging lens to space characters on film.

the character spacing problem.[4] A total of eight different Mergenthaler experts, each of whom were named as inventors in photocomposition patents, worked futilely on the design of an optical spacing system.[5] Accordingly, the Caldwell invention was not obvious to one ordinarily skilled in the art.

■ When processing the Caldwell application, the Patent Office cited the Chireix patent 1,893,158 and the earlier Eppenstein patent 1,589,797. Although it did not consider all of the preceding patents, the omitted patents were no more relevant to Caldwell's invention than the cited references. Compare T. P. Laboratories v. Huge, 371 F.2d 231 (7th Cir. 1966); Hazeltine Research Corp. v. Avco Corp., 227 F.2d 137 (7th Cir. 1955). The Patent Office's analysis of the prior art therefore strengthened the statutory presumption of validity contained in 35 U.S.C. § 282. See, *e. g.*, Walt Disney Productions v. Fred A. Niles Communications Center, Inc., 369 F.2d 230, 234 (7th Cir. 1966); Shumaker v. Gem Mfg. Co., 311 F.2d 273, 275 (7th Cir. 1966); Radio Corp. of America v. Radio Engineering Laboratories, 293 U. S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934). Defendants have failed to overcome this presumption. Since the Caldwell patent

was neither anticipated by the prior art nor obvious under 35 U.S.C. § 103, it is valid and enforceable.

■ *B. Infringement.* Defendants' devices are only charged with infringing the most inclusive claim, number one.[6] Eltra manufactures three accused devices, the Quick machine,[7] the Linofilm photounit, and the Linotron 505.

Eltra emphasizes two alleged distinctions between its devices and claim 1. First, the methods by which its machines select the character to be photographed purportedly do not qualify as "means for putting in the focal plane of the collimating lens an image of the character to be projected." The Quick machine uses a complicated arrangement of optical wedges to present the image at the projection "gate." The Linofilm device employs a group of lenslettes and a shutter combination which permit only one character to be projected at a time. The Linotron 505 utilizes a video tube, a lens array, a matrix grid plate, and photo multipliers to produce segments of the character. Each segment is individually projected onto the correct portion of the film, so that the character becomes fully assembled and forms a complete image.

As explained by Dr. Joseph Harrington, Jr.[8] and admitted by defendants'

---

4. The contemporaneous failures of those who are expert in the art tend to indicate that an invention is not obvious. See, *e. g.*, Illinois Tool Works, Inc. v. Continental Can Company, 397 F.2d 517 (7th Cir. 1968).

5. Eltra introduced no evidence indicating that its employee, Ferguson, independently invented the trombone effect.

6. Claim 1 includes:
   "In photographic type composing apparatus, the combination of a collimating lens, means for putting in the focal plane of the collimating lens an image of the character to be projected, an illuminating device to project the images of selected characters forming a line successively through the collimating lens, each character having a predetermined width value and being projected while it is in the projection position, a translating lens combina-

tion including a converging lens and a reflector arranged one behind the other to focus the projected light and reflect it through a predetermined angle, a support to hold a sensitized surface in substantial coincidence with the focal plane of the light leaving the lens combination, and means for displacing the lens combination relative to the collimating lens and longitudinally of the surface after each projection by variable distances proportional to the widths of the corresponding characters, whereby each character is focused upon the surface irrespective of the relative positions of the two lenses."

7. Logan Square uses Linofilm photounits at its Chicago plant.

8. Associated with Arthur D. Little and Company, Dr. Harrington was excellently qualified to evaluate the various machines.

experts,[9] however, all of the machines utilize the trombone effect. In each, once a character or segment appears at the gate,[10] the image is projected in collimated light, then reconverged, and finally reflected onto the proper portion of the film. The imaging lens and mirror, or their equivalents, slide back and forth in the beam of collimated light.

The second asserted distinction relates to that part of claim 1 which specifies "means for displacing the lens combination * * * by variable distances proportional to the widths of the corresponding characters * * *." Rather than having a lens-mirror structure which moves intermittently, the carriages employed in the Linofilm and Linotron machines are constantly in motion. A strobe light or similar device is flashed so quickly that it effectively stops the carriage's movement when the character or segment is projected. Analysis of the pertinent claim language, "by variable distances," indicates that it only requires variable displacement, not inter-

mittent motion. The patent therefore encompasses the accused machines.[11]

In addition to literal infringement, the accused devices incorporate the teachings of claim 1 under the doctrine of equivalents. Each machine positions and spaces characters on photographic film, thus performing the specified function. The devices' basic structure and mode of operation are equivalent because each machine utilizes movable lenses and reflectors that slide parallel to the film in collimated light. All three accused machines also achieve the result described in the Caldwell patent since, they employ lightweight, fast-operating character spacing systems which prevent changes in the characters' size or brilliancy despite the components' movement. Thus, the Quick, Linofilm and Linotron machines infringe under the doctrine of equivalents. See, e. g., King-Seeley Thermos Co. v. Tastee Freeze Industries, Inc., 357 F.2d 875, 880 (7th Cir. 1966); Graver Tank and Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).[12] Compare

9. For example, in his deposition Eltra's Chief Engineer, Dr. Grube, agreed that once the Quick machine delivers an image to the gate, the trombone principle thereafter spaces the characters on the sensitized film.

10. Delivery of a character to the projection position presents a photocomposition problem essentially unrelated to the one solved by Professor Caldwell. In fact, Eltra conceded that it has several patents specifically covering character presentation means; each of the techniques employed in the accused machines is individually patented.
Nevertheless, Eltra argues that the patent's file wrapper history restricts claim 1 to character presentation means embodying a spinning disc. In amendment C the applicant stated that the invention comprised:
"The combination of the optical system described in the specification with a character width displaying means generally, which may specifically be the means described in the above-mentioned copending application."
The reference to an optical system, however, relates to the lenses and mirrors used in the trombone effect, instead of

the specific means of character presentation at the gate.

11. Eltra argues that the patent's file wrapper history restricts Photon to intermittent motion because Caldwell's second amendment declared that:
"Claims 1 to 3 have been amended to point out explicitly an important feature, namely, that the converging lens is moved relative to the collimating lens and along the sensitized surface by varying distances, which distances correspond to the widths of successive projected characters."
Instead of restricting the patent to intermittent motion, Caldwell's statement specifies variable distance character spacing, which may be accomplished by a constantly moving carriage and intermittently flashing strobe light.

12. The Supreme Court declared that:
"One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and vary rare type of infringement. To prohibit no other would place the

Kennatrack Corp. v. Stanley Works, 314 F.2d 164, 167 (7th Cir. 1963).

C. *Laches.* Although Photon learned of the Linofilm infringement in 1960, it did not institute this suit until 1967. Eltra therefore asserts that the Caldwell cause of action is barred by laches.[13] But, Eltra was notified of the Caldwell patent and Photon's intent to enforce its provisions by a series of letters and conferences between 1958 and 1961.[14] Thereafter, the parties engaged in sporadic settlement negotiations in an attempt to resolve their differences without litigation. In 1962 Mergenthaler took a royalty-bearing license from International Photon Corporation,[15] thus recognizing some economic virtue in plaintiff's invention. Plaintiff and defendant could not, however, agree on the amount of royalties, if any, to be paid.[16] Under these circumstances, Photon's delay was reasonable. Eltra has offered no evidence that it believed plaintiff would refrain from enforcing the patent, nor has it indicated any detrimental reliance during the seven year interlude. Apparently, its continued production of infringing machines resulted from a deliberate decision to try to defend successfully the patent suit which would ultimately be instituted. Accordingly, Photon is not foreclosed by laches. See,

e. g., Shaffer v. Rector Well Equipment Co., 155 F.2d 344, 345 (5th Cir. 1946); Howe v. General Motors Corp., 167 F. Supp. 330 (N.D.Ill.1958).

## II. HIGONNET PATENT

Prior to the actual projection of a character onto film, the person operating the keyboard must select the letters to be composed. With different type styles, an individual character such as "b" will have varying widths. Since the lines of type must be justified, any width assigned to a particular style "b" may also require differential adjustment during the composition process. In conventional printing, metal type and additional slugs are used to space the characters; thus, styles of type, or fonts, occupy a substantial area. Due to the metal's weight, changes from one font to another necessitate mechanical shifting.

In his combination patent, Higonnet first suggested that familiar electrical printed circuits, or cards, could be used to represent the width values of characters in photocomposition, thereby facilitating the selection of type styles. Specifically, ordinary printed circuits are designed so that an operator may chose an individual character and the proper width information will be entered into a register.[17] Internal storage

---

inventor at the mercy or verbalism and would be subordinating substance to form."

13. The Quick machine was not marketed until 1965 at which time the plaintiff unequivocally charged it with infringement. The Linotron device was not marketed until after the lawsuit was brought. Laches is therefore not a defense to infringement by these machines.

14. To illustrate, a November 4, 1958 letter declared that:
"The Foundation [Photon's predecessor] is the owner of a number of patents in the field of photographic type composition which are believed to be infringed by the 'Linofilm' machine manufactured by your company."
On May 2, 1961, plaintiff's counsel specified the Caldwell patent as follows:
"In answer to your request, Photon, Inc. owns Patent No. 2,670,665 which

covers the commercial Photon machine * * *."

15. International Photon owns all foreign patents corresponding to the United States Caldwell patent. The corporation was then separate from the plaintiff, Photon, Inc.

16. Plaintiff explicitly repeated its infringement charges in 1963 and 1965. Mergenthaler did not deny the accusations but countered by asserting infringement against Photon's machines.

17. The card has input circuits corresponding to each potential character. When a letter is selected, the electrical connections indicate the appropriate width, and the output circuits then lead into a register. Later transferred to the photographic unit of the machine, the width information may control a character spacing unit similar to the one described in the Caldwell patent *supra.*

circuity thus memorizes and transmits character widths. Additional electrical switching circuitry allows an operator to select among different fonts.[18] Compared with the prior art, the light, compact cards described in the Higonnet patent permit easy style selection; trays of relatively heavy metal type no longer need to be physically interchanged.

■ *A. Validity.* Alleging anticipation and obviousness, Eltra's attack on the patent's validity resembles its Caldwell defense. Ten prior art patents are cited.

Morss patent 1,829,233 and Buckwell patent 1,949,036 describe how a modified typewriter may be electrically connected to an adding machine. A line's total width values can then be automatically computed as the type is composed. Neither patent indicates how type styles might be changed; in fact, on page six of the Morss patent, starting at line ninety-four, the inventor declares that:

> "It is to be noted that the style of type in the typewriter is a matter of small importance." [19]

In the Cook reissue patent 22,350, magazines of metal code bars must be replaced when a new type style is selected. Although two to four of these magazines may be located in the machine, style selection requires physical and mechanical exchanges, in contrast to Higonnet's basically electrical approach.[20]

Utilizing a mechanical linkage, the Rossetto reissue patent 25,354 also demonstrates a composing device with interchangeable trays of metal code bars. In column 1, starting at line forty-five, the patent states:

> "Preferably the code bars of the front group are mounted in a removable tray so that they may be conveniently removed for interchange whenever a different font or type face is desired."

Moreover, the patent neither shows a plurality of groups of code elements nor teaches an electrical means for selecting among the type styles.[21]

A patent is anticipated by the prior art only if substantially the same invention is described in an earlier reference. See, *e. g.*, Illinois Tool Works, Inc. v. Continental Can Co., 397 F.2d 517 (7th Cir. 1968). As indicated above, several of the cited patents are inapposite because they employ essentially mechanical means for style selection. Those references which contain electrical elements merely show how to compute the total width value of a line or to change cases within a single style of type. None of the prior art teaches Higonnet's novel contribution—the use of circuit elements to represent character width values, thereby facilitating type style selection

---

18. The Higonnet patent explains that:
    "The principal object of this invention is to reorganize and simplify the means for transmitting information from the key board to the registering device.
    " * * * [A] principal feature of the invention resides in providing a number of selectable multiple-circuit elements, and *means under the control of the character keys* and other keys actuated by the operator for connecting selected circuits of these elements with the register." Column 1, starting at lines 42 and 64.

19. Item 60 in figures 6 and 9 of the Morss patent is an electrical contact block used to shift between upper and lower case characters within the same style of type. There is no circuitry which stores in-

formation, nor is there a plurality of elements for chosing among various fonts.

20. Similarly, Ogden patent 2,441,899 describes metal code bars, and Nicholas patent 964,678 employs a large block that must be changed when fonts are replaced.

21. Oldenboom patent 2,353,061, Eisler patent 2,441,960, Doty patent 2,318,299 and British patent Uchida 499,900 are unrelated to photocomposing. They discuss electrical connections in telegraph devices, radio components, and accounting machines. None of the references suggest that electrial printed ciruits might represent width information and thereby facilitate changing type styles in photocomposition.

in photocomposition.[22] Therefore, the patent in suit is not anticipated.[23]

■ Considering the state of the art when the invention was conceived, a Professor of Electrical Engineering at Massachusetts Institute of Technology, Dr. Truman S. Gray, explained that Higonnet's development was not obvious to one ordinarily skilled in the art.[24] In fact, prior to 1953 Higonnet and Moyroud spent five years experimenting before they conceived their new concept. At least seven highly skilled Mergenthaler scientists unsuccessfully tackled the width value and style changing problems during a ten year period, from 1946 to 1956, without discovering the Higonnet approach.[25] Therefore, the invention was not obvious to one ordinarily skilled in the art.[26]

No references are cited at the end of the Higonnet patent. While the Patent Office was considering the application, however, Photon and Mergenthaler waged two separate interferences. Although defendant now asserts that the patent's claims are invalid, in 1958 Mergenthaler obtained virtually the same claims in Robbins patent 2,848,049. During the first interference,[27] the six most pertinent prior patents were presented by Mergenthaler to the Patent Office.[28] Relying upon Rule 259 of the Patent Office,[29] Mergenthaler argued that the

22. Immediately prior to the Patent Office's allowance of Corrado patent 3,061,182, Mergenthaler argued that claims basically identical to those now in controversy were patentable, declaring that:

"As far as the references are concerned, it is enough to point out that all of the claims now require a *plurality* of width card elements. * * * In all the references there is only one width card element for one particular set up and this width card element must be removed and replaced by a substitute element when it is desired to change the values of the elements."

Moreover, when applying for Robbins patent 2,848,049, Mergenthaler represented to the Patent Office that Johnson patent 536,149, which is similar to the references cited above, "would be totally unsuitable for applicants' purpose, which is to provide a character width code mechanism that will serve for a whole series of different type fonts."

23. Eltra maintains that the prior art patents are more relevant to certain claims than to others. But all of the claims in controversy (17, 18, 30, 36, 38, 42, 43, 44 and 45) embody the basic Higonnet invention. Since that discovery is not disclosed in the cited references, separate discussion of individual claims is unnecessary.

24. Defendant's expert, Robert J. Donahue, claimed that the invention would have been obvious. Not having been active in the field in 1953, however, Donahue expressed only hindsight. The Seventh Circuit has cautioned that:

"[C]ourts must guard against the exercise of hindsight in assessing the obviousness of a given improvement in the art." Zegers v. Zegers, Inc., 365 F.2d 156, 159 (7th Cir. 1966).

25. To illustrate, the first Linofilm machine, completed about 1950, used mechanical matrices for width coding and then photographed the characters.
Furthermore, when the Corrado patent 3,061,182 was being processed by the Patent Office, Mergenthaler contrasted claims similar to the Higonnet contribution with a typical prior art patent, Reppert 2,-487,373, as follows:

"Reupert discloses but one character width code element and it is not obvious how he could employ more than one such element."

26. Although defendants did not plead lack of utility, they raised this defense in their post-trial brief. The commercial success of an invention demonstrates its utility. See, e. g., Continental Can Co. v. Anchor Hocking Glass Corp., 362 F.2d 123 (7th Cir. 1966). Such success is shown by Photon's 1967 sales of photocomposition machines employing the Higonnet or Caldwell patents exceeding $13 million.

27. Of the claims now in dispute, numbers 36 and 38 were involved in the first interference, 90,599. The second interference, 95,875, did not relate to any Higonnet claims before this Court.

28. Defendant cited Nicholas patent 964,-678, Morss patent 1,829,233, Buckwell patent 1,949,036, Cook reissue patent 22,350, Ogden patent 2,441,899 and Rossetto reissue patent 25,354.

29. "The Board of Patent Interferences may, either before or concurrently with their decision on the question of priority, but independently of such decision, direct

Higonnet claims were invalid. The Board of Patent Interferences rejected defendant's contention, stating that:

"In their brief, Robbins, et al. [defendant] referred to Rule 259 relating to recommendations to the Commissioner as to matters not relating to priority. No such recommendation will be made in this case."

Since the most relevant references were presented to the Patent Office before the patent was issued, the statutory presumption of validity is strengthened. *Compare* Shumaker v. Gem Mfg. Co., 311 F.2d 273, 275 (7th Cir. 1962), *with* Anderson Co. v. Sears, Roebuck & Co., 265 F.2d 755, 761 (7th Cir. 1959), and Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 803 (7th Cir. 1949). Even if that presumption were ignored, the defendants' evidence fails to demonstrate invalidity. Since the invention was neither anticipated by the prior art nor obvious under 35 U.S.C. § 103, the Higonnet patent is valid and enforceable.

■ *B. Infringement.* Eltra manufactures and sells the Linofilm keyboard unit, the Linoquick perforator unit and the Quick photocomposing machines.[30] The nine claims in controversy have been divided into three groups: (1) 17, 18 and 30, (2) 36 and 38, and (3) 42, 43, 44 and 45. Eltra admits literal infringement by the Linofilm keyboard unit with respect to the claims in groups 2 and 3. Defendant also agrees that claims 42, 44 and 45 read literally upon the Linoquick keyboard unit and the Quick machine. The only remaining infringement issue is whether claims 17, 18 and 30 cover the Linofilm and Linoquick keyboard units.[31]

After explaining in detail how the Linofilm and Linoquick devices operate, Professor Gray testified that these units contain each of the elements listed in claims 17, 18 and 30.[32] The trial exhibits also indicate that the challenged machines embody the patent's claims.

Nevertheless, defendants emphasize several minor distinctions. First, they allege that their style selection means are not "operable" to connect the input circuits with the input connections.[33] In the Linofilm and Linoquick units, those elements are permanently joined. The accompanying electrical circuitry in each machine demonstrates, however, that (1) only one card or width plug will respond to the keys at any given time, and (2) this responsive printed circuit is selected by the style selection buttons. Thus,

---

the attention of the Commissioner to any matter not relating to priority which may have come to their notice and which, in their opinion, * * * amounts to a bar to the grant of a patent to either of the parties for the claim or claims in interference."

30. Eltra also produces the "Super Quick" photocomposing device which is indistinguishable from the Quick machine, insofar as they relate to this litigation. ·
Logan Square uses the Linofilm keyboard units in its Chicago plant.

31. Claims 18 and 30 are similar to claim 17, which provides:
"In type composing apparatus, the combination of a keyboard having character keys, an input circuit for each character key, a holder supporting a plurality of selectable multiple-circuit card elements, there being an element for each of a plurality of selectable styles and each element having an input connection corresponding to each input

and output connections permanently joined with the input connections to represent the widths of the corresponding characters, style selection means adjacent the keyboard and operable to connect the input circuits with the input connections of a selected element, and register means connected with the output connections of said selected element."

32. At the trial Eltra's employee, Donahue, disclaimed infringement. But in his prior deposition testimony, Donahue admitted that each of the claims' elements is found in the Linofilm and Linoquick keyboard units, with the exception of claim 30's application to the Linofilm device.

33. The next to last item specified in claim 17 is:
"style selection means adjacent the keyboard and operable to connect the input circuits with the input connections of a selected element * * *."

the accused style selection means determine when the defendants' input circuits will be electrically connected with the input connections.

Second, defendants maintain that their register means is not "connected with" the selected output element. In the accused devices, a tape punch and/or a line length accumulator separate the output element from the actual paper tape. But the accused "register means" include the tape, the tape punch, and the line length accumulator. Each of these items helps record the width information which is provided by the appropriate width card or width plug. Accordingly, the challenged register means are connected with the appropriate output element.

Finally, the defendants stress physical differences in the machines' construction and operation. To illustrate, the Linofilm device is a two-unit machine, in contrast to the single unit Photon apparatus. Also, the binary coders employed in the accused devices are slightly different than the one in plaintiff's machine. Since neither of these distinctions relates to the patent's language or its novel contribution to the art, the Linofilm and Linoquick keyboard units literally infringe claims 17, 18 and 30 of the Higonnet patent.[34]

In addition to literal infringement, Photon alleges that all of the challenged devices are covered by the doctrine of equivalents. All of the units perform the function described in the patent; they correctly determine character width values. Appropriate keyboards, multiple-circuit cards, electric circuitry, style selection means, and register means are combined in all of the accused machines. Each device employs the same basic structure and operates in the manner specified in the patent. Moreover, all of the units accomplish Higonnet's desired result; they facilitate changing type styles. Accordingly, the Linofilm keyboard, the Linoquick perforator, and the Quick photocomposing machines infringe under the doctrine of equivalents.

*C. Late Claiming.* Eltra asserts that claims 36, 38, 42, 43, 44 and 45 are invalid because it acquired intervening rights before those claims were presented to the Patent Office.

Although the patent was originally filed in 1958, certain claims were not explicitly added until as late as 1966. The extensive delay resulted from the two protracted interferences. The later claims did not significantly change the Higonnet patent. The elements enumerated in each challenged claim are disclosed in the patent's specification which has remained virtually unchanged since its initial filings. Moreover, the original claims, such as number one,[35] included

---

34. Defendants also advance several miscellaneous arguments. For example, the challenged machines purportedly employ a mechanical shifting of the array of printed circuits, rather than a purely electrical switch. All electrical switches, such as a pole switch, require mechanical movement to make electrical contact. Defendants' units merely utilize more mechanical movement to activate the circuitry.

Earlier, Eltra emphasized the Linofilm's use of a perforated tape, rather than a mechanical register. During the first interference, the Board of Patent Interferences rejected this distinction as follows: "The first matter urged by the junior party [Mergenthaler] is that the counts are directed to a machine for producing coded signals in a tape, and that the Higonnet *et al* application discloses a machine which uses a mechanical register rather than such a tape."

* * * * *

"It seems to us that both Robbins *et al* in their patent and Higonnet *et al* in their application regarded the specific machines for punching a paper tape as being well known in the art so that detailed description thereof was unnecessary, and we agree with the Primary Examiner that under the circumstances of this case at least the Higonnet *et al* application contains sufficient disclosure to support the limitations of the counts as to mechanism for producing coded tape."

35. At first, that claim encompassed: "In type composing apparatus, registering means including, in combination, a number of input circuits, means to energize the circuits to represent the

all of the later, more particularized claims.[36]

Eltra's intervening rights depend upon alleged sales of infringing Linofilm devices about 1956. Although Linofilm machines were marketed then, Eltra has presented no evidence that those units embodied the Higonnet width value invention. Rather, the early Linofilm machines employed non-infringing combinations. Infringing devices were not sold until 1958. Since the Higonnet patent application was filed in 1958, Eltra did not obtain intervening rights. See, *e.g.*, King-Seeley Thermos Co. v. Refrigerator Dispensers, Inc., 354 F.2d 533, 539 (10th Cir. 1965); Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467, 477 (9th Cir. 1961). The challenged claims are therefore not invalidated by Photon's late claiming.

### III. COUNTERCLAIM

The only machine now charged with infringement, Photon's "Keycomp," was not sold until almost one year after the counterclaim was filed.

■ *A. Rossetto reissue patent 25,354.* The only claim in controversy, number 52, is invalid because the reissue patent enlarged the scope of the original patent more than two years after its issuance, contrary to 35 U.S.C. §§ 251 & 282.[37] The diagrams, specifications, and claims originally covered a single group of character width code elements and removable trays of metal code bars which had to be mechanically interchanged. See, *e. g.*, claim 38 and figure 8 of Rossetto patent 2,847,919. When the patent was reissued, however, claim 52 described a mechanism for selecting among numerous fonts, as follows:

> "a plurality of groups of code elements having different character width values as between groups, the different groups of character width code elements representing different type fonts * * * and means for selecting one or another of the groups of character width code elements according to the font of type characters to be composed."

Rather than one group of character width code elements, claim 52 thus expanded the original patent to include a "plurality of groups" and means for selecting among the groups.

In addition, claim 38, characterized by Mergenthaler as the broadest original claim, is limited to:

> "the code elements of the second group being adjustable to different operative positions in relation to the finger keys * * *."

But claim 52 is not restricted to adjustable code elements. An accused machine might therefore infringe the reissue claim without infringing the original claims. Accordingly, claim 52 is broader than the initial patent and thus invalid under 35 U.S.C. § 251. *Compare* Rohm & Haas v. Roberts Chemicals, 245 F.2d 693, 700 (4th Cir. 1957); In re Freedlander, 143 F.2d 982, 984, 31 CCPA 1199 (1944).

Moreover, even if claim 52 were valid, it would not be infringed by the Keycomp machine because the accused device operates in a different manner. The Rossetto reissue patent utilizes a mechanical shifting mechanism and metal

---

selected characters in a line successively, a number of selectable multiple-circuit elements, means for making a number of input and output connections with a selected element, each element being adapted to join predetermined input and output connections, the input connections being joined with said input circuits, and register means joined with said output connections."

36. Eltra has also failed to demonstrate that Photon's delay was unreasonable.

See, *e. g.*, Wirebounds Patents Co. v. Saranac Automatic Mach. Corp., 37 F. 2d 830, 839 (6th Cir. 1930).

37. Section 251 declares that:
"No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

code bars to store character widths. In contrast, the Keycomp unit employs the Higonnet invention; printed circuits represent the characters' width values, thereby facilitating the electrical changing of type styles.

*B. Robbins reissue patent 26,144.* The Keycomp allegedly infringes claim 76 which is a combination of old claims 60 and 39. The patent examiner rejected claim 60 because it had already been patented. The only distinction between claim 76 and claim 60 is the following provision:

" * * * the character width code elements in each of the different groups represent in decimal form the unit width values of the type characters in the corresponding group, and wherein the automatic computer mechanism also includes a further group of code elements for converting into binary form the decimal unit width values of the type characters of the selected group, said group of binary code elements being common to all of the groups of decimal code elements."

The preceding language is identical to claim 39 which the patent examiner had already rejected.

In light of the prior Higonnet patent in suit 3,332,617, claim 76 would have been obvious to one ordinarily skilled in the art. The Higonnet patent shows (1) width cards that represent character width values in decimal form, and (2) "set" cards which convert decimal signals to binary signals. Since each style card can be switched to connect with any given set card, each of the set cards is common to all of the groups of decimal code elements. Claim 76 is therefore invalid under 35 U.S.C. § 103.

If claim 76 were considered valid, however, the Keycomp would infringe its provisions. The only asserted difference is the patent's use of set width values, rather than the relative width values employed in the accused device. Relative widths are computed by comparison to a standard length, such as the typographical "em," whereas set widths are actual measurements expressed in inches or centimeters. Since the "em" necessarily has an absolute width, relative widths and set widths are functionally interchangeable. Under the doctrine of equivalents, therefore, the Keycomp machine would infringe claim 76.

*C. Corrado patent 3,061,182.* In the second interference, the Patent Office awarded Higonnet claims 4 through 7 of the Corrado patent. Since there was no appeal, that judgment is final and claims 4 through 7 are cancelled.[38] But, claims 4 through 7 are the only ones asserted against the Keycomp unit. The Corrado portion of the counterclaim thus fails to state a cause of action.

## IV. ATTORNEYS' FEES

Mergenthaler became aware of the Caldwell patent in 1954; four years later Mergenthaler sold the Linofilm optical system without any pretext of avoiding infringement. One year before the Quick machine was marketed, Photon explicitly warned defendant that it would infringe the Caldwell claims. Nevertheless, the accused device was not changed in any manner, and Eltra continues to distribute it without modification.

With respect to the Higonnet invention, defendant was notified of plaintiff's claims in 1959 when the first interference began. In 1966 plaintiff won the contested claims from defendant, yet the latter did nothing to avoid infringement. In this lawsuit, Eltra admits infringing claims 36, 38, 42, 43, 44 and 45 but persists in manufacturing its devices without alteration.

For more than ten years, Eltra has thus had ample opportunity to change its numerous infringing machines, but it has refused to do so. Its deliberate, wilful

---

38. 35 U.S.C. § 135 states that:
"A final judgment adverse to a patentee from which no appeal or other review has been or can be taken or had shall constitute cancellation of the claims involved from the patent * * * "

infringement of plaintiff's patents constitutes bad faith.

Furthermore, Eltra's bad faith was documented at trial. The evidence demonstrated that during the past decade defendant advanced baseless charges of infringement in an attempt to intimidate plaintiff. Eltra also prosecuted the Rossetto reissue patent application which, as explained earlier, clearly enlarged the scope of the original patent contrary to 35 U.S.C. §§ 251 & 282. Similarly, the infringement allegations of Eltra's instant counterclaim were used, without justification, to threaten plaintiff; the only machine challenged at trial was not marketed until one year after the counterclaim was filed. Moreover, Eltra sued on claims 4 through 7 of the Corrado patent, even though they had been cancelled in the second interference.

Attorneys' fees are only awarded to a plaintiff in exceptional cases, such as when a defendant has proceeded in bad faith and has deliberately infringed plaintiff's patents. See, e. g., P & D Sales & Mfg. Co. v. Winter, 334 F.2d 830, 836 (7th Cir. 1964). Eltra is guilty of such conduct here. Under 35 U.S.C. § 285, Photon is entitled to reasonable attorneys' fees.

## V. CONCLUSION

When Caldwell and Higonnet conceived of their respective inventions, neither discovery would have been obvious to one ordinarily skilled in the art. Both patents were preceded by extensive periods of experimentation; prior to the inventions, numerous competing experts attempted unsuccessfully to solve the respective photocomposition problems. Moreover, the relevant prior art did not suggest that collimated light might be used to space characters in photocomposition, nor did earlier references teach that electrical circuit elements might represent character width values and thereby facilitate type style selection. Thus, neither the Caldwell patent nor the Higonnet patent were anticipated by the prior art. Each of the patents is valid and enforceable.

All of defendants' accused machines infringe plaintiff's two patents. Caldwell claim 1 reads literally upon the Quick, Linofilm and Linotron machines. Compared with that patent, each challenged device performs the specified function, achieves the identical result, and embodies the same basic structure and mode of operation. In addition, the Linofilm keyboard unit infringes all nine of the Higonnet claims in suit; the Linoquick keyboard device infringes claims 17, 18, 30, 42, 44 and 45; and, the Quick machine infringes claims 42, 44 and 45. Besides literal infringement, these units are also covered by the doctrine of equivalents.

Defendants' allegations of laches and late claiming are unsupported. Eltra has not established that it detrimentally relied upon plaintiff's failure to sue promptly or that it acquired intervening rights invalidating the Higonnet claims. Photon's respective delays were reasonable.

In its counterclaim, Eltra seeks to enforce invalid claims in the Rossetto and Robbins reissue patents. The former is broader than the original patent, and the latter would have been obvious in light of the Higonnet development. The contested Corrado claims were cancelled during an earlier interference.

Plaintiff shall prepare and submit an appropriate judgment order by August 27, 1969.