TECHNITROL, INC., Plaintiff,

v.

MEMOREX CORPORATION and the National Cash Register Company, Defendants.

Nos. 70 C 2916 and 71 C 1083.

United States District Court,
N. D. Illinois, E. D.

May 17, 1974.

S. C. Yuter, Yuter & Fields, New York City, Robert L. Harmon, Hume, Clément Hume & Lee, Ltd., Chicago, Ill., for plaintiff.

Alfred H. Plyer, Jr., Parker, Plyer & McEachran, Chicago, Ill., for Memorex.

Theodore W. Anderson, Neuman, Williams, Anderson & Olson, Chicago, Ill., for NCR.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This matter is before the Court on the motions of the defendants, the National Cash Register Co. (NCR) and Memorex Corp. (Memorex), for summary judgment. For the reasons set forth below, NCR's motion is granted, and Memorex's motion is denied. This action is one for infringement of U.S. Patent No. 2,611,813 (Sharpless). Both defendants assert that the doctrine of laches bars this action. This motion calls into question the activities of the parties dating back over twenty years. The facts, as culled from affidavits and exhibits, provide an interesting insight into the development of the computer industry.

On September 23, 1952, the Sharpless patent was issued. It related to a magnetic data storage system whereby information was conveyed by electrical impulses from many remote terminals. The system would allow persons at the remote access terminals to insert or withdraw information. One purpose was to allow for storage of information concerning reservations on public carriers. Prior to the issuance of the patent, the defendant, NCR, through its predecessor, Computer Research Corporation (CRC), began marketing products, CRC 101 and 102, which plaintiff contends infringe its patent. NCR, after acquiring CRC, continued marketing the products.

On June 16, 1955, almost three years after the patent's issuance, Technitrol first attempted to license the patent to NCR. Prior to this, on March 4, 1954, NCR obtained an opinion from outside counsel that the CRC 101 and 102 systems did not infringe the Sharpless patent. On July 27, 1955, after some negotiations, NCR tentatively agreed to accept a license. However, this agreement was never consummated and on April 4, 1956, NCR declared that it was not then producing any infringing products (despite the fact that the CRC 101 and 102 systems were being produced) and had no present interest in a license. No further communication took place between Technitrol and NCR for two and one-half years.

On October 12, 1958, over six years from the patent's issuance, Technitrol again attempted to license NCR. Negotiations took place and a license was once again rejected. There were no further communications between NCR and Technitrol regarding a license from December 1958 until December 1963.

In December 1963, Technitrol once again sought to license NCR. NCR conducted some studies, reviewed its file and concluded that the patent was invalid. In June 1964, plaintiff's counsel wrote NCR and stated that he was de-

sirous of receiving an answer to his proposal very soon. On October 13, 1966, NCR wrote Technitrol and denied any infringement and rejected the license offer. It did offer a possible cross-license in order to protect itself in any future product development. There was no further communication between the parties until April 1969.

In April 1969, Technitrol informed NCR of the pendency of a Court of Claims action against the United States Government, which it had begun in 1965. In May 1969, Technitrol informed NCR that it would be included as a class defendant in a proposed infringement action in Maryland. The class action was denied. The patent expired on September 23, 1969. Suit against NCR was filed on November 20, 1970.

While these events were occurring, other relevant events were taking place. The computer industry as a whole grew and developed. Technitrol followed this growth with a fairly successful licensing program of the Sharpless patent. IBM was licensed in 1954. Letters offering other licenses were sent out in 1955. Sperry Rand was licensed in 1962, General Electric in 1963, RCA, Burroughs and General Precision in 1964, and North American Aviation and Bunker Ramo in 1965.

In addition to the licensing program, Technitrol was involved in several lawsuits. The first suit, against Sperry Rand, was filed in October 1958, over six years after the patent was issued. That case was finally settled, with a license being issued in 1962. Next, the United States was sued in 1964, Control Data in 1966, Honeywell in 1967, and S. D.S. in 1968. In 1969, Technitrol attempted to establish a class action in the *Control Data* case. It was after this was denied that suit was brought against NCR in 1970, as noted above.

Other events also occurred during these years. NCR expanded its total gross sales in electronic data processing equipment from $3,366,004 in 1961 to $125,504,157 in 1971.[1] NCR developed various new systems, including the "315" in 1960, the "395" in 1964 and the "615" in 1968. Also, several people important to the litigation have died or are incapacitated. T. K. Sharpless, the co-patentee and inventor, died in 1967. NCR's principal outside counsel, John Hoxie, died in 1971. NCR's chief internal patent counsel, Louis Kline, who was involved in almost all of the negotiations, suffered a heart attack in 1972 and is incapable of testifying or participating in NCR's defense. Professor Howard Aiken, a pioneer in computer development and developer of certain important prior art died in 1973. Further, records relating to early computer developments are no longer available.

### I.

■ The first question is whether summary judgment is appropriate. F. R.Civ.P. 56(c) provides, *inter alia*, that judgment should be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Also, the evidence should be construed in a light most favorable to the opposing party. The Court is aware that it is unusual to grant summary judgment based upon laches, a doctrine whose history is rooted in the ancient chancery practice; however, this Court believes that the evidence in this case is clear, that there are no genuine issues of material fact and that summary judment is appropriate. See Continental Coatings Corp. v. Metco, Inc., 325 F.Supp. 165–166 (N.D. Ill.1971), aff'd, 464 F.2d 1375, 1377–1379 (7th Cir. 1972).

### II.

■ In order to effectively assert the defense of laches, two elements must be present. First, there must be a lack of

---

1. See Appendix A, attached. Appendix A is a summary report prepared by NCR and attached to its motion as Appendix B to its brief in support of its motion for summary judgment.

diligence on the part of the plaintiff. Second, there must be injury to the defendant due thereto. Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008, 1012 (7th Cir. 1970), *quoting* Rome Grader & Mach. Corp. v. J. D. Adams Mfg. Co., 135 F.2d 617, 619 (7th Cir. 1943).

Mere delay is not sufficient; there must be disadvantage to another. Universal Coin Lock Co. v. American Sanitary Lock Co., 104 F.2d 781, 782 (7th Cir. 1939), *quoting* George J. Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.2d 505–507 (7th Cir. 1928).

■■ When the delay in prosecuting a claim appears unreasonable, the burden is on the patentee to excuse it. Baker Mfg. Co. v. Whitewater Mfg. Co., *supra*, at 1009. In patent cases, the burden is placed upon the plaintiff after a six year period has passed (this is analogous to the statute of limitations, 35 U.S.C. § 286). *Id.* at 1010. Injury to the defendant is presumed and plaintiff must justify the delay. *Id.* In the instant case, the patent issued in September 1952, and suit was not brought until November 1970, a delay of 18 years. Plaintiff urges several reasons for the inapplicability of the laches doctrine and gives a number of excuses for the delay; however, the Court believes that the undisputed facts require granting of defendant NCR's motion as a matter of law.

■ Plaintiff first asserts that laches is inapplicable in a patent action which seeks only damages for past harm, the patent having expired two years before suit was filed. It offers no cases in support of this proposition. Several courts have applied the doctrine of laches to patent actions where the patent had expired. See Whitman v. Walt Disney Prods., Inc., 263 F.2d 229, 230 (9th Cir. 1958); Dock & Terminal Engng. Co. v. Pennsylvania R. R., 82 F.2d 19 (3d Cir. 1936). Courts have also applied the doctrine of laches to the portion of the case which sought retrospective relief. See, *e. g.*, Baker Mfg.

Co. v. Whitewater Mfg. Co., *supra*. The Court therefore believes that the doctrine of laches may be appropriate in the instant case. *Cf.* F.R.Civ.P. 8(e)(2); F. James, Civil Procedure §§ 8.2, 8.6 (1965); 2A J. Moore, Federal Practice ¶ 8.32, at 1892 (2d ed. 1974).

■ There can also be no serious question that NCR has been harmed. First, there is the presumption of harm to the defendant after a six year delay. See Baker Mfg. Co. v. Whitewater Mfg. Co., *supra* at 1010; see also General Electric Co. v. Sciaky Bros., Inc., 304 F.2d 724, 727 (6th Cir. 1962); Whitman v. Walt Disney Prods., Inc., *supra* at 231. In addition, the following uncontroverted events have taken place. NCR's investment and sales have increased many times, thereby resulting in its substantially changing its position. See, *e. g.*, *id.*; Continental Coatings Corp. v. Metco, Inc., 325 F.Supp. 165, 167 (N.D.Ill.1971), aff'd, 464 F.2d 1375 (7th Cir. 1962); see also Brennan v. Hawley Prods. Co., 182 F.2d 945 (7th Cir. 1950); Rome Grader & Mach. Corp. v. J. D. Adams Mfg. Co., 135 F.2d 617 (7th Cir. 1943); George J. Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.2d 505 (7th Cir. 1928). Three key witnesses; (the inventor, T. K. Sharpless; NCR's trial counsel, Hoxie; and an inventor of certain prior art, Aiken) have died. In addition, NCR's house counsel, Kline, is incapacitated. Many documents relating to the early development of computers have been destroyed or are missing. This certainly impairs NCR's ability to defend the action. See Brennan v. Hawley Prods. Co., 182 F.2d 945, 948 (7th Cir. 1950); see also Gillons v. Shell Co. of California, 86 F.2d 600, 609 (9th Cir. 1936).

■ Technitrol contends, however, that the delay was not a cause for harm and that NCR did not rely on Technitrol's inaction. First, this ignores the presumption of harm which exists under these circumstances. Second, it ignores the fact that NCR received an opinion in 1954 from outside counsel that its prod-

ucts were noninfringing. NCR has relied thereon throughout the entire period. Although it discussed licensing from time to time, it did so because of a desire to protect possible future developments and not to defend itself from a present infringement charge. After so many years had passed, with only several attempts to license, with no follow up, and with long intervals of silence, NCR must be deemed to have relied on Technitrol's inactivity.

### III.

■ Technitrol offers several reasons for the delay. It first asserts that NCR lulled it into a position of non-action through its representations and therefore has "unclean hands." The record is to the contrary.

NCR (through its predecessor, CRC) had been producing its system prior to the date the patent was issued. From that date until June 16, 1955, no action was taken by Technitrol against NCR. Although NCR made a preliminary acceptance of a license, on April 4, 1956 it declared it was not infringing and had no present interest in a license. Technitrol, despite this clear notice, did nothing until October 1, 1958, two and one-half years later, when it again offered NCR a license. NCR again rejected a license and no further communication was had for five years, until December 1963. NCR re-examined the patent in terms of its products. Technitrol relies on an internal NCR memo, dated May 22, 1964, to support its position that NCR was considering a license. However, Technitrol did not see this memo or rely upon it at the time. Further, the memo clearly discusses the concept of a license under the Sharpless patent in a conditional sense, using "if" to predicate the discussion. In no sense could this memo or any other NCR document be considered as deceiving Technitrol or showing unclean hands. This also applies to a second internal NCR memorandum, dated June 29, 1964, which clearly states that NCR believed it never infringed and that NCR believed that Technitrol could not be convinced, despite any evidence, of the invalidity of the patent.

In October 1966, NCR sent a letter to Technitrol in which it stated again that it was not interested and did not believe the patent to be valid. However, in order to protect future lines, it was willing to explore cross-licenses. It reiterated this on November 21, 1966. Nothing further was heard from Technitrol for two and one-half years, until April 1969, when Technitrol wrote NCR and stated that its belief was that nothing had been done because of the United States government litigation. In May 1969, the attempted class action was begun. That failed and suit was brought against NCR in November 1970.

Technitrol asserts that NCR failed to inform it of its belief that the patent was invalid. There is no evidence to support this conclusion. NCR consistently told Technitrol that it was not infringing and did not want a license. What is present here are sporadic attempts to license, met with rejections, and followed by long periods of inactivity. Also, Technitrol warned NCR in June 1964, nine years after the first communication, that it wanted some response, "or else." Suit was not brought, however, until six years later. This case differs from cases such as Photon, Inc. v. Eltra Corp., 308 F.Supp. 133 (N.D. Ill.1969) and Holland Co. v. American Steel Foundries, 95 F.Supp. 273 (N.D. Ill.1950), where the total delay was only seven years and settlement negotiations were continuously taking place. In the instant case, the undisputed facts disclose that there were only sporadic attempts at negotiation, followed by long periods of inaction. See Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1376–1378 (7th Cir. 1972); see also Whitman v. Walt Disney Prods., 148 F.Supp. 37, 40 (S.D.Cal.1957).

■ Technitrol next asserts that it was constantly involved in litigation and could only afford to maintain one suit at

a time. Several preliminary facts should be set out. First, Technitrol did not sue anyone in the computer industry until 1958, over six years after its patent had issued and over three years after its first attempt to license all of the members of the industry. Second, after Technitrol filed suit against the United States government in April 1964, it was able to simultaneously maintain suit against it, Control Data (commenced in 1966), Litton (commenced in 1966), Honeywell (commenced in 1967), Collins (commenced in 1967) and Xerox (commenced in 1968).[2] In any event, a lack of funds is not a sufficient excuse to justify an unreasonable delay. See, *e. g.,* Whitman v. Walt Disney Prods., 148 F.Supp. 37, 40 (S.D.Cal.1957), aff'd, 263 F.2d 229 (9th Cir. 1958).

Moreover, the existence of other litigation does not provide an automatic excuse for a delay. See, *e. g.,* American Home Prods. Corp. v. Lockwood Mfg. Co., 483 F.2d 1120, 1123 (6th Cir. 1973); Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008, 1014–1015 (7th Cir. 1970). Courts have upheld the defense of "other litigation" where there was either notice that there would be a delay pending the resolution of another suit or an agreement between the parties to that effect. See, *e. g.,* Maxon Premix Burner Co., Inc. v. Eclipse Fuel Eng. Co., 471 F.2d 308, 312–313 (7th Cir. 1972); Armstrong v. Motorola, Inc., 374 F.2d 764, 769 (7th Cir. 1967); *compare* American Home Prods. Corp. v. Lockwood Mfg. Co., *supra* at 1123. Technitrol asserts that its belief was that the industry knew that the *Sperry Rand* litigation would stay any other litigation. However, it offers nothing more than its belief. This is clearly insufficient. Furthermore, Technitrol's contention that the industry would await the outcome of the *Sperry Rand* litigation is inconsistent with its attempts to

license NCR in 1958, which began almost simultaneously with that suit.

Technitrol never informed NCR that it would stay any action against it nor did it make a formal charge of infringement. Technitrol asserts, however, that the suit against the United States in the Court of Claims in 1964 served as notice to NCR since the government was NCR's customer. It should first be recalled that this suit was not commenced until 12 years after the patent's issuance. Also, there was no requirement on NCR to become a party, nor did Technitrol seek its joinder. See Boutell v. Volk, 449 F.2d 673, 677–678 (10th Cir. 1971). NCR declined to take part in the suit, although it did offer the government its validity study. This contention is also inconsistent with Technitrol's attempts to license NCR during the 1964–66 period, when, supposedly, it was in effect suing NCR. Technitrol never informed NCR that it would also be sued, or that suit against it would be delayed. In 1969, Technitrol attempted to explain a two and one-half year period of silence by stating that it believed NCR had not been in communication with it because of the Court of Claims suit. However, there is nothing to substantiate this belief. Also, NCR might have assumed that Technitrol was not serious inasmuch as other companies were being sued, and it had never received notice of this possibility. The Court therefore finds that the "other litigation" doctrine offers no excuse for Technitrol's delays.

 Technitrol offers one final excuse for the delay. It asserts that NCR was a good customer and it did not want to lose its business. Courts have rejected this as a defense. See General Electric Co. v. Sciaky Bros., 304 F.2d 724, 727 (6th Cir. 1962). Furthermore, it is inconsistent with Technitrol's claim that NCR was put on notice of an action

---

**2.** Technitrol, in its affidavits, claimed that its royalty fees were approximately equal to litigation expenses. This is not a sufficient

showing of poverty nor does it meet the burden placed upon it.

against it because of the *Sperry Rand, Court of Claims* and other litigation.

Technitrol also urges that NCR threatened it with a loss of business if it sued. It makes this claim in the affidavit of its President, Mr. Eichert, who claims that between 1966–1970 he received reports from his sales department that NCR would terminate its business if it sued. Mr. Yuter, Technitrol's counsel, claims in his affidavit that Mr. Eichert did not want to antagonize NCR because it was a good customer. But assuming that there were such threats in the 1966–1970 period, this does not justify the delay from 1952 to 1966. Moreover, it appears that the concern was Technitrol's, not NCR's. Finally, and most important, the claim of threats is predicated upon pure hearsay, "reports from the sales department." There are no written documents, no names of Technitrol employees receiving such threats, no dates when threats were made, and no evidence as to who made such threats. This is not the type of evidence upon which the Court can rely and plaintiff has failed to meet its burden. See F.R.Civ.P. 56(e); see also, Automatic Radio Co. v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); American Security Co. v. Hamilton Glass Co., 254 F.2d 889, 893–894 (7th Cir. 1958).

In summary, the undisputed facts disclose that for 18 years Technitrol sat on any rights it had against NCR, to NCR's detriment. Accordingly, the Court will grant NCR's motion for summary judgment based upon laches.

## IV.

NCR also seeks attorneys' fees based upon Technitrol's activities. 35 U.S.C. § 285 provides for attorneys' fees in "exceptional cases." NCR asserts that Technitrol's activities during the last twenty years [3] make this an exceptional case.

In order to be an "exceptional case," it must appear that the case is not an ordinary one and plaintiff's activities are unconscionable or inequitable. See, generally, Apex Elect. Mfg. Co. v. Altorfer Bros. Co., 238 F.2d 867, 874 (7th Cir. 1956). The purpose of Section 285 is to prevent gross injustice. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294–297 (9th Cir. 1969). Courts have usually looked for deliberate falsity. See, e. g., id.; compare I. F. Strassheim Co. v. Gold Medal Folding Furniture Co., 477 F.2d 818 (7th Cir. 1973) with Pickering v. Holman, 459 F.2d 403 (9th Cir. 1972). Awards are made in the court's discretion. Id. at 408.

Two conflicting cases highlight the difficulty the Court faces in resolving this problem. In Brennan v. Hawley Prods. Co., 98 F.Supp. 369 (N.D.Ill.1951), Judge Campbell, on remand, awarded attorneys' fees where the Court of Appeals had held that an action was barred by laches, when the delay was for 14 years. See Brennan v. Hawley Prods. Co., 182 F.2d 945, 947 (7th Cir. 1950). In Briggs v. Wix Corp., 308 F.Supp. 162, 171 (N.D.Ill.1969), Judge Campbell, then Chief Judge, declined to award attorneys' fees, where the delay was for 19 years. Thus, the mere length of delay alone cannot be the basis for the award.

The Court believes that attorneys' fees are not appropriate here. First, there is not that quality of wilfullness that is required to make this an "exceptional case." Although plaintiff slept on its rights and did not meet its burden of explaining the delay, its activities in the period did not constitute merely remaining silent and then attempting to

---

3. In addition to the aforementioned facts, NCR accuses Technitrol of utilizing delaying tactics in this Court. This is based upon a stay obtained in these proceedings while a stay was apparently requested in the *Control Data* litigation in order to allow this case to go foreward. The Court does not believe that there is evidence that this was done wilfully or intentionally, nor does the Court believe that Technitrol has attempted to delay and obstruct these proceedings.

gain. It was involved in some litigation and it had licensed some parties. Furthermore, the facts constituting laches were present in 1970 when the case was filed and NCR must bear part of the burden for not raising the issue earlier and causing its attorneys' fees to increase. Attorneys' fees are therefore denied.

### V.

Memorex seeks summary judgment under the theory of "industry laches." It has filed no affidavits or supporting materials; it relies merely on NCR's documents.

Courts have applied the doctrine of laches to an entire industry where a patentee remained silent as to its rights with respect to an entire industry and permitted widespread infringement. See, e. g., Briggs v. Wix Corp., 308 F. Supp. 162 (N.D.Ill.1969); Eastman Ko-dak Co. v. McAuley, 41 F.Supp. 873 (S.D.N.Y.1941); compare Briggs v. M & J Diesel Locomotive Filter Corp., 228 F. Supp. 26 (N.D.Ill.1964), aff'd, 342 F.2d 573 (7th Cir. 1965).

In the instant case, summary judgment would be inappropriate. First, fact issues as to Technitrol's relations with Memorex or other companies may exist. Second, no evidence has been presented showing either delay or particularized harm to Memorex.

It is also evident that Technitrol did not sit by and allow industrywide infringement. It pursued a licensing program and also was involved in litigation. The Court has no information concerning when Memorex entered the industry, the knowledge it had of the Sharpless patent or of its relationship with Technitrol. For these reasons, Memorex's motion will be denied.

It is so ordered.

### APPENDIX A

#### NCR GROSS SALES TOTALS (DOLLARS) FOR ELECTRONIC DATA PROCESSING EQUIPMENT (EDP)

| | MODEL 315 SYSTEMS | MODEL 615 SYSTEMS | TOTAL EDP |
|---|---|---|---|
| 1951 to 1960 | Summary Data for the period 1951–1954 (Computer Research Corporation) and for the period 1954–1960 (National Cash Register) was not available at the time of filing this motion. If the court deems it necessary for a determination of this cause, the relevant data for the period 1951–1960 can be assembled also. | | |
| 1961 | | | 3,366,004 |
| 1962 | 722,706 | | 12,371,465 |
| 1963 | 8,794,146 | | 19,911,932 |
| 1964 | 17,752,376 | | 31,309,564 |
| 1965 | 18,004,894 | | 33,239,668 |
| 1966 | 23,606,541 | | 43,263,636 |
| 1967 | 29,337,968 | | 54,535,159 |
| 1968 | 34,736,399 | 27,414 | 64,934,749 |
| 1969 | 28,755,639 | 12,158,488 | 77,565,968 |
| 1970 | 28,649,447 | 38,664,993 | 101,310,858 |
| 1971 | 25,348,773 | 59,838,572 | 125,504,157 |