COLONIAL ALLOYS COMPANY, a partnership of Samuel L. Cohn and Charles C. Cohn, Plaintiff,

v.

KINKEAD INDUSTRIES, INC., Defendant.

No. 74 C 602.

United States District Court, N. D. Illinois, E. D.

June 9, 1975.

George A. Smith, Philadelphia, Pa., for plaintiff.

Thomas F. McWilliams, Dennis M. McWilliams, Chicago, Ill., for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

AUSTIN, District Judge.

By order of January 9, 1975, I severed for trial Defendant Kinkead Industries, Inc.'s claim that Plaintiff Colonial Alloys Company should be barred by laches from maintaining this patent infringement action because it unreasonably and prejudicially delayed in filing suit. Prior to that order, I considered and denied Defendant's motion for summary judgment based upon the laches defense, holding that genuine factual issues remained for decision by a fact-finder at trial. At a hearing before me on May 28 and 29, 1975, the parties developed and presented evidence relating to the laches argument.

Upon consideration of all matters of record, I now hold that the defense of laches is meritorious and that the complaint must be dismissed with prejudice.

## FINDINGS OF FACT

I find that:

A. *Patent and License History*

1. The patent in suit, No. 2,729,551, issued on January 3, 1956 to Charles C. Cohn and expired on January 2, 1973. The patent describes a bright-dipping process of finishing aluminum and is entitled a "Method of Surface Treatment of Aluminum and its Alloys by the Use of a Heated Mixture of Phosphoric and Nitric Acid." It resulted from a series of applications in the Patent Office, the earliest of which was filed on September 28, 1946, giving the Cohn patent application a pendency of over nine years before issuance of the patent.

2. During the pendency of the Cohn applications, numerous affidavits were filed indicating that the conception and reduction to practice of the Cohn process occured as early as 1942. Subsequently, one of the originally-named inventors of the bright-dip method filed an affidavit disavowing that he was a co-inventor. Additionally, the Board of Appeals of the Patent Office twice rejected the Cohn applications on the grounds that Cohn was not the first inventor of the process. (DX-10).

3. On August 25, 1953, patents Nos. 2,650,156 and 2,650,157 issued to Aluminum Company of America (Alcoa) (DX-6, 7). These patents concerned an aluminum finishing and polishing bright-dip method.

4. On June 20, 1955, Alcoa licensed Defendant to use the processes covered by patents Nos. 2,650,156 and 2,650,157 as well as other earlier-issued patents. This agreement was one of some 400 licenses granted by Alcoa for use of its bright-dip procedures.

5. During the prosecution of the Alcoa patent applications, an interference was declared between the Alcoa and Cohn applications. This proceeding was dissolved by the Patent Office in

1951 for unpatentable breadth. No resolution was made as to the issue of priority of invention.

6. Subsequently, the Cohn application was continued in an *ex parte* prosecution and, in January 1956, after extensive in-office proceedings, the Cohn patent issued with claims dominating the Alcoa patents.

7. Upon determining that its methods were dominated by the Cohn patent, Alcoa negotiated with Plaintiff Colonial Alloys Company, a partnership of Samuel L. Cohn and Charles C. Cohn, for a license under the patent in suit.

8. On March 14, 1956, an agreement was concluded between Alcoa and Colonial whereby Alcoa acquired a license under the Cohn patent and the authority to represent Colonial in issuing sublicenses at specified royalty rates. These royalties were to be paid to Colonial through Alcoa and Alcoa received a fee for its administration of the sublicensing program. (DX-14).

9. Thereafter Alcoa offered to its approximate 400 licensees a license under the Cohn patent and simultaneously withdrew its own patents from the earlier licenses. Substantially all of Alcoa's licensees, including Defendant, accepted the amended license. There is no evidence that Alcoa ever submitted to Defendant a copy of the Cohn patent. (DX-15, 16).

10. In March 1959, by letter agreement between Alcoa and Colonial, Alcoa was permitted to make recommendations and give assistance to non-licensees concerning any kind of aluminum chemical brightening process that Alcoa might encounter. Alcoa was under no duty to advise these non-licensees of possible infringement of the Cohn patent nor was it required to inform Colonial of infringing activity. Alcoa's sole obligation under this letter agreement was to notify non-licensees of the existence of the Cohn patent and the availability of a license thereunder. (DX-18).

11. From this time until the expiration of the patent in suit, Alcoa continuously dealt with licensed and non-licensed users of the bright-dip processes which fell within the claims of the Cohn patent. At no time did Alcoa advise Colonial of the existence of any infringers and at no time did Colonial inquire of Alcoa concerning possible infringement.

12. In 1955, with Alcoa's assistance, Defendant installed in its plant an aluminum-treating system, which featured the Alcoa bright-dipping method. At all relevant times, Kinkead looked solely to Alcoa for technical advice in this endeavor.

13. From 1955 through 1960, Kinkead encountered difficulties with the Alcoa bright-dip process and found that the products subjected to the method were not commercially satisfactory. Throughout this period, Kinkead and Alcoa made substantial efforts to develop a satisfactory operating procedure for this method but were unable to achieve commercially satisfactory results.

14. In February 1960, in an attempt to solve its bright-dip problems, Kinkead employed Edward Bangs, an individual with experience in aluminum finishing and with knowledge concerning the Alcoa bright-dip method. Upon his employment with Kinkead, Bangs began to make changes in the Alcoa process, including alterations in operating temperatures, percentages of acids and waters, and the content of the bath composition. In a short period of time, the bright-dip process, which had been unsatisfactory under Alcoa's direction, became commercially satisfactory to Kinkead.

15. At this time, Kinkead operated under its original license from Alcoa, which had included the Alcoa patents but was modified in 1956 to cover the Cohn patent. Bangs informed Kinkead's management that the corporation's current bright-dip method, as amended by

Bangs, was no longer the same process which had been promoted and licensed by Alcoa. In good-faith reliance on this information, Kinkead determined that it no longer required the Alcoa license and that it could employ its amended process without infringement.

B. *Termination of the Alcoa License*

16. By letter of April 13, 1960, Kinkead informed Alcoa that it had ceased bright-dipping aluminum by the process covered by the patents dominating the licenses and gave notice of the termination of their license agreement. (DX-19).

17. Although the fact of the Kinkead cancellation was communicated by Alcoa to Colonial in 1960, the reason for termination was not learned by Colonial until 1974 when it requested from Alcoa a copy of the termination notice.

C. *Colonial's Position Prior to 1972*

18. From 1960 to 1973, Colonial negotiated and maintained, in addition to the Alcoa licensing arrangement, two other Cohn patent license agreements. It took no action whatsoever to investigate any possible infringement of its patent.

19. From 1956 to the expiration of the Cohn patent, Colonial collected royalties in excess of $600,000 from its Alcoa sublicensees and an additional $120,000 from other licensees. Despite this large income, Colonial spent no money to ferret out possible infringers of its patent.

20. During the years from 1960 to 1973, Colonial sponsored an advertisement in which it stated that "Nearly everybody who uses an aluminum bright-dip employs this basic (patented)* method." ` (DX-22). The asterisk identifies the patent in suit. Charles Cohn testified that, when this ad was run and at all times until 1972, he believed that everyone who used an aluminum bright-

dip process was a licensee under his patent.

21. In fact, however, throughout this period, in generally-distributed brochures, bulletins, and other sales materials, Defendant Kinkead—a non-licensee—engaged in a bright-dip process and advertised that fact. (DX-15).

22. Furthermore, during the same time, various chemical companies—including Monsanto Chemical Co., Stauffer Chemical Co., Victor Chemical Co., and Mobil Oil Co.—extensively advertised and promoted the use of phosphoric acid for bright-dipping and issued detailed trade articles describing and encouraging the use of the process in suit. (DX-54–61).

23. Despite this widespread activity in an area in which Charles Cohn was performing continued research and development, Colonial did not act. In effect, Colonial did not pursue possible infringers, but chose to receive substantial royalties and to avoid litigation costs and the threat of a judicial holding of patent invalidity.

D. *Colonial's Activities from 1972 to 1974*

24. In late 1972, shortly before the expiration of the patent in suit, Charles and Samuel Cohn began, for the first time, an investigation of possible infringers of the Cohn patent. In conducting this investigation, the Cohns sought to locate evidence establishing the infringing use of their bright-dip process by non-licensees. Further efforts were undertaken to determine the extent of the infringement.

25. This inquiry included intensive library and telephone book searches, newspaper ads, and discreet requests to corporations for information concerning their bright-dipping techniques.

26. As a result of its investigation in 1972, 1973 and 1974, Colonial accumulated a list of hundreds of possible in-

fringers. Notices of infringement were mailed to many companies and, in some instances, claims were filed for patent infringement. The entire procedure from the investigation to the institution of suit encompassed a time period of a few months.

27. In 1973, while searching at the Franklin Institute Library in Philadelphia, Pa., Charles Cohn encountered an article in a 1968 issue of *Modern Metals*, a trade publication of general circulation. This article was written by E. J. Monte, Kinkead's Product Finishing Manager, and stated that Kinkead engaged in a bright-dip process.

28. The investigative techniques used by the Cohns from 1972 to 1974 were available to them during the years from 1960 to 1972. If the same techniques had been employed between 1960 and 1972, the identities of possible infringers would have been readily available to the Cohns. If Cohn had searched at the Franklin Institute in late 1968, he would have found the 1968 *Modern Metals* magazine and would have thereby known that Kinkead was engaging in possible infringement of his patent.

29. In March 1973, after the expiration of the Cohn patent, Colonial charged Kinkead with infringement of the patent. This was the first notice of infringement received by Kinkead from Colonial. This lawsuit was commenced on March 4, 1974.

E. *Defendant's Prejudice*

30. Defendant has been substantially and irrevocably prejudiced by Plaintiff's inactivity and failure to bring suit until 1974.

31. There is sufficient evidence in the record—including the nine-year prosecution of the Cohn patent application, the various conflicting affidavits filed, the disclaimer of one person as a joint inventor, and the rejection of all claims by the Patent Office's Board of Appeals

—to conclude that, if an infringement action had been brought on the instant claims in the 1960's, a serious question concerning the patent's invalidity could have been raised. (DX-9, 12, 39, 40).

32. By delaying 14 years in giving notice of infringement and in suing, Plaintiff has foreclosed any meaningful analysis of the validity of this patent. The alleged dates of conception and reduction to practice of the Cohn invention are in 1942. Due to the passage of time, all witnesses, except Charles Cohn, involved in the laboratory work leading to the invention, are dead. Many other witnesses with possible material evidence as to invalidity and laches are also deceased. And certain records which are conceivably pertinent to an intelligent appraisal of the Cohn patent have been destroyed or lost to floods.

33. From 1960 to the time it received the Colonial notice of infringement, Kinkead looked to Alcoa for advice concerning its use of its modified bright-dip process. The evidence establishes that, despite the fact that throughout the relevant period it was Colonial's primary licensing agent and that its representatives frequently visited the Kinkead plant and were aware that Kinkead employed a bright-dip process, Alcoa never informed Kinkead of any possible infringement and never suggested that Kinkead obtain a Cohn patent license. Under these circumstances, Kinkead was justified in assuming that its process was not in derogation of any patent rights.

34. Based on its reasonable assumption of noninfringement, from 1960 to 1973, Kinkead substantially increased its use of its bright-dipping method—in part by the building of a new plant at Union City, Tennessee at a cost in excess of 1.5 million dollars—and installed in its new plant a greatly-expanded bright-dip operation. If it had been notified of infringement prior to the building of the new plant, Kinkead

would have resolved the charge before proceeding with its construction plans.

35. In 1969, United States Gypsum Company purchased all the shares of stock of Kinkead. In course of the acquisition, Kinkead was required to inform Gypsum of any claims or liabilities, including charges of patent infringement, against Kinkead of which it was aware. Kinkead did not notify Gypsum of any claim of infringement of the patent in suit because there had been no such charge and Kinkead assumed that no such charge existed. In taking over Kinkead, Gypsum relied upon this statement and believed that no such charge existed.

36. Any Finding of Fact herein which may be construed, in whole or in part, as a Conclusion of Law shall be deemed as such.

## CONCLUSIONS OF LAW

I conclude that:

1. The Court possesses subject-matter and personal jurisdiction to resolve Plaintiff's claim and Defendant's laches defense.

2. The defense of laches must be applied to bar the prosecution of this lawsuit because Plaintiff has failed to adequately explain its 14-year delay in bringing suit, because Defendant has demonstrated its substantial prejudice in defending against the Cohn patent at this late date, and because Defendant has not acted inequitably in regard to its use of a modified bright-dip process. *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008 (7th Cir. 1970); *Potash Co. v. International Minerals & Chemical Corp.,* 213 F.2d 153 (10th Cir. 1954); *Boris v. Hamilton Mfg. Co.,* 253 F.2d 526 (7th Cir. 1958). *See Jones v. Ceramco, Inc.,* 387 F.Supp. 940 (E.D.N.Y.1975); *Siemens Aktiengesellschaft v. Beltone Electronics Corp.,* 381 F.Supp. 57 (N.D. Ill.1974); *Technitrol, Inc. v. Memorex Corp.,* 376 F.Supp. 828 (N.D.Ill.1974). *See also American Home Products Corp. v. Lockwood Mfg. Co.,* 483 F.2d 1120 (6th Cir. 1973); *Continental Coatings v. Metco, Inc.,* 174 U.S.P.Q. 423 (N.D. 1972); *Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.,* 373 F.Supp. 851 (M.D.Pa.1974).

3. At all relevant times after 1960, Plaintiff partnership had actual or constructive knowledge of possible infringement of the Cohn patent but failed to act against such infringement. Specifically, Plaintiff failed to inform Defendant of any possible infringement.

4. Due to Plaintiff's long delay in bringing suit, Defendant has been injured to its detriment in its defense of this case.

5. Considering the Colonial-Alcoa and Alcoa-Kinkead business relationships, the improved results of the Bangs' bright-dip method, and Bangs' advice to Kinkead that the altered process was non-infringing, Defendant's continued use of the process at issue cannot be deemed to constitute a clear and deliberate act of infringement of the Cohn patent.

6. Likewise, Defendant's April 3, 1960 letter of termination cannot be considered to be an international misrepresentation of fact.

7. Defendant is entitled to a dismissal of this claim with prejudice.

8. Any Conclusion of Law herein which may be construed, in whole or in part, as a Finding of Fact shall be deemed as such.