**GENERAL ELECTRIC COMPANY,**
Plaintiff-Appellant,

v.

**SCIAKY BROS., INC., Defendant-Appellee.**

Nos. 14464–65.

United States Court of Appeals
Sixth Circuit.

Decided June 20, 1962.

As Corrected June 27, 1962.

tory judgment that four Sciaky patents were invalid and not infringed by its control mechanisms. Sciaky counterclaimed for infringement of two of its patents being Nos. 2,431,083 and 2,415,-708.

In its second action filed on August 28, 1958, General Electric sued Sciaky for infringement of eight patents owned by it.

After an extended hearing, the District Judge handed down a memorandum opinion in both cases, which he adopted as findings of fact and conclusions of law, and held that General Electric was barred by laches and estoppel from asserting infringement of six[1] of its patents and that said two Sciaky patents were valid and infringed by General Electric.

In the present appeals only four General Electric patents, being Garman No. 2,361,846, Whiteley No. 2,315,916, Livingston No. 2,331,124 and Livingston No. 2,384,937, and two Sciaky patents being Nos. 2,431,083 and 2,415,708 are involved.

We will discuss the questions in the order in which they were presented to us.

*Laches and Estoppel as Barring Enforcement of General Electric Patents.*

The six General Electric patents in suit were issued in the years 1943, 1944 and 1945.

Suit for infringement was not filed until 1958. No notice of infringement other than that provided by the suit was ever given.

At the time of the hearing in the District Court in 1959 all of the General Electric patents were then growing old and by the end of the present year will have expired.

None of the General Electric patents were included in the declaratory judgment case filed by General Electric against Sciaky in 1957. In his state-

Dugald S. McDougall, Chicago, Ill. (Casper W. Ooms, Chicago, Ill., T. Donald Wade, Daniel J. Tindall, Jr., Detroit, Mich., on the brief), for plaintiff-appellant.

Edmund C. Rogers and Lawrence C. Kingsland, St. Louis, Mo. (Kingsland, Rogers, Ezell & Robbins, St. Louis, Mo., on the brief), for defendant-appellee.

Before MARTIN[*] and WEICK, Circuit Judges and DARR, Senior District Judge.

WEICK, Circuit Judge. These appeals are in patent infringement cases which were consolidated for trial in the District Court. General Electric is engaged in the business of manufacturing and selling electrical equipment and supplies including control components for use in electric resistance welding machines. Sciaky manufactures and sells complete welding machines. The patents in suit relate to apparatus and methods of electric resistance welding.

In its first action filed on May 10, 1957, General Electric sought a declara-

---

[*] Our colleague, Judge John D. Martin, who presided on the day the case was argued orally, died on April 2, 1962, and did not participate in the decision.

1. The other two patents were dropped from the case by General Electric.

ment to the District Court, the counsel then representing General Electric explained to the Court why they were not included in its first action as follows:

"General Electric—nothing much happened in the case. Somebody then in General Electric said, 'We have a lot of patents, haven't we?' And somebody said, 'Yes.' 'What are we doing with them?' 'They are sitting over there in the file.' 'Well, that doesn't seem very sensible, why doesn't somebody look them up and see what they are, see who is infringing on these things, and why not start with Mr. Sciaky.' And so they did, and they found eight patents in the General Electric port-folio that appeared to be infringed by Sciaky."

Two of the General Electric patents in suit were Livingston '553 and Bivens '982. It was undisputed that in July 1949 General Electric sent a letter to the welding trade, which included Sciaky, to the effect that General Electric had no present intention of asserting any claims of said two patents, among others, against welding manufacturers or their customers applicable primarily to complete resistance welding equipment sold by welding machine manufacturers. This was a plain invitation to welding machine manufacturers to use the patents. The District Court held that the letter estopped General Electric from maintaining an action against Sciaky for infringement of the two patents. General Electric has not questioned this ruling in these appeals.

The District Court found that General Electric had been dealing with Sciaky since 1940 and was well acquainted with every patent including those in suit affecting the welding business and with that knowledge endeavored to arrange a cross-licensing between Sciaky's and some of its own patents, but failed to do so; that in August 1958, long after the six year statute of limitations had run, General Electric for the first time claimed infringement by Sciaky of its patents although Sciaky machines allegedly using

the accused features had been discussed between the parties since 1948; that the No. 3 machine (Sciaky '083) went into production in 1945; that a three-phase to single-phase machine employing an anode transformer was exhibited by Sciaky in an open house attended by General Electric personnel in October 1945. The District Court enumerated many of the items of evidence showing knowledge for a long time by General Electric of Sciaky's machines and inventions, including its acquisition of Sciaky drawings, inspection of the machines and actual purchase of some of them by Hot Point, a General Electric subsidiary. The Court further found that General Electric never marked the products which it sold with a patent notice as required by Title 35 U.S.C. § 287. The Court further found General Electric's delay in bringing suit was "completely unexplainable, inexcusable and unreasonable."

The Court further found that Sciaky would be substantially and irreparably damaged if General Electric were allowed to change its position. Sciaky had sold 990 welding machines at an average cost of $16,000 a machine between 1954 and 1958. It spent about $100,000 a year on advertising. It built up a valuable business. It had a sales and service force and an established good will. During the years 1948–1956 Sciaky's sales of welding machines totalled $43,000,000.

■ In view of General Electric's failure to mark its products as required by statute, or to give any notice of infringement, it could not, in any event, recover damages for infringements occurring prior to the filing of the action for infringement. Dunlap v. Schofield, 152 U.S. 244, 14 S.Ct. 576, 38 L.Ed. 426; Smith v. Dental Products Co., 140 F.2d 140 (C.A. 7); Horvath v. McCord Radiator & Mfg. Co., 100 F.2d 326 (C.A. 6), certiorari denied 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed. 486, rehearing denied 308 U.S. 636, 60 S.Ct. 171, 84 L.Ed. 529. In this Court, General Electric stated that it "seeks only prospective relief, an in-

junction and damages for infringements committed after August 21, 1958 when suit was filed." Brief p. 50.

This case involves more than mere delay by General Electric in the enforcement of its rights. The delay, as found by the District Court, was unreasonable, inexcusable and unexplained. General Electric had knowledge of Sciaky's machines at least since 1948 and failed to bring action for infringement until nearly ten years later. Whether General Electric might have been influenced by the fact that Sciaky was making substantial purchases of electrical supplies from it is not material. Nor did the Korean war furnish any justification for the delay as was claimed in the District Court.

Where the unexplained delay exceeded the applicable period of the statute of limitations, injury to the defendant is presumed. In a patent infringement action equitable principles are applied. Equity will not aid those who have slept on their rights. The failure of General Electric to take action over the many years constituted laches. Whitman v. Walt Disney Productions, Inc., 263 F.2d 229 (C.A. 9); Smith v. Sinclair Refining Co., 257 F.2d 328 (C.A. 2); Gillons v. Shell Co. of California, 86 F.2d 600 (C.A. 9); Woodmanse & Hewitt Mfg. Co. v. Williams, 68 F. 489 (C.A. 6).

In the present case, we need not rely on any presumption as the Court found injury.

The facts distinguish this case from the trade-mark case of Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526, which was relied on by General Electric and involved a mere failure to enforce trade-mark rights. Where more than mere inaction is involved the doctrine of laches and estoppel will prevent enforcement of trade-mark rights. Ambrosia Chocolate Co. v. Ambrosia Bakery Co., 165 F.2d 693 (C.A. 4).

Whether or not General Electric was guilty of laches was a question of fact to be determined by the trial judge in the exercise of judicial discretion. Gillons v. Shell Co. of California, supra. We are of the view that the findings of fact adopted by the District Court on this issue are supported by substantial evidence and are not clearly erroneous. They are binding on us. Frank Adam Electric Co. v. Federal Electric Products Co., 200 F.2d 210 (C.A. 8); Gillons v. Shell Co. of California, supra. We think his conclusions of law were correct.

The fact that General Electric wanted licenses on Sciaky's patents and negotiated with Sciaky on a cross-licensing basis did not in our judgment excuse the long delay in enforcing its own rights. The District Court found that in so doing General Electric was engaged in a "fishing expedition." In any event, the negotiations between the parties ceased in 1951 and General Electric took no action until seven years later.

*Sciaky Patents '083 and '708*

In the District Court, General Electric claimed that Sciaky was barred by laches from enforcing his patents. The District Judge found on the facts that Sciaky was not guilty of any laches, but had given General Electric notice of infringement and took aggressive steps including actions for infringement to enforce its patents against others. This matter was not included in the questions presented in General Electric's brief filed in this Court and, therefore, requires no further discussion on our part.

'083 patent was issued November 18, 1947 and had special application to the welding field although it was not limited thereto. It was entitled "Electric Valve Converting Systems." It provides the method and apparatus for converting polyphase [2] electric power to single-phase

2. Where a single two wire circuit is used to transmit alternating current, it is called single-phase. Where two or more co-ordinated circuits are used it is called polyphase. The commonest form of poly-phase is three-phase which is ordinarily used for industry and is delivered by three wires.

form as this was the only form issued in electric resistance welding.

The system provides a resistance welding current consisting of a unidirectional current impulse of chosen and adjustable duration which may be adjusted to suit the type of material to be welded. The system will also deliver a series of unidirectional current impulses of the same polarity or a series of current impulses, each of which is opposite in polarity to the one immediately preceding it. The welding current impulses are made up from a series of power supply impulses. The duration of the welding current impulse depends upon the length of time the timer maintains the circuits closed. Each impulse is unidirectional and is detached from other impulses.

The apparatus has three separate phase circuits where each primary winding is individually connected to its respective phase of the polyphase supply line and the same current that comes from the supply lines flows directly to the welding transformer. Prior art machines had an anode transformer through which the current passed from the supply line before it reached the welding transformer. '083 had a novel circuit which eliminated the anode transformer. An anode transformer would have added about $1,000 to the cost of each machine and would use from 30 to 50% more electric current in operation.

The patent explained the principle of operation as follows:

"In the electric power converting system of the invention the first impulse of primary current generates magnetic flux in the transformer and each successive current impulse flowing through the windings in sequence according to the phase relation of the source has the effect of building up this magnetic flux, with the result that a steady rise in the flux takes place, inducing an impulse of unidirectional current in the secondary windings. In order for the magnetic flux to rise in a steady manner the use of electric

valves is required. The valves rectify the currents of the respective phases so that they have a unidirectional flow. Thus, each magnetizing current impulse will flow through its primary winding in a direction to augment the magnet flux, and one impulse of unidirectional current is induced in the secondary, comprising the combined output of the phases of the polyphase supply for that particular energization."

This new principle of operation was called "accumulation of flux" by Sciaky's expert which resulted from the combination of the three winding transformer and the control system.

Claim 2 of the patent is illustrative of the method and provides:

"The method of converting polyphase current to unidirectional current impulses, which consists in rectifying the current in each phase respectively of the polyphase current source to derive current impulses from the phases having the same polarity, passing said rectified currents through separate windings according to the phase relation of the electromotive forces in the polyphase current supply, whereby to cause magnetizing current impulses to flow through said windings in the same direction to produce a unidirectional rise of the magnetic flux caused by the successive action of said windings, controlling the duration of the current flowing period for said windings, and during said period inducing a unidirectional electromotive force in a secondary winding inductively associated with said first mentioned windings."

Claim 5 describes the apparatus as follows:

"In a system for delivering power to a single phase work circuit from a polyphase alternating current supply, the combination including a transformer having a second-

ary winding electrically connected to said work circuit and a plurality of primary windings each electrically connected to its respective phase of the polyphase alternating current supply, each primary circuit including an electric valve and means for controlling flow of current through said valve."

Sciaky '708 relates to the control pattern rather than the power problem involved in '083. It provides for wave shaping. It was a new method with large current in welding heat and small in post-heat.

Claim 3 is representative and provides:

"A method of electric welding, which consists in rectifying an alternating supply current to direct current, applying impulses of said direct current to the primary winding of a welding transformer to thereby induce impulses of welding current in the secondary circuit, and in varying the voltage of the direct current applied to the primary winding during each impulse in a controlled manner, whereby the resulting welding current for each impulse produces a controlled heating effect and which may be predetermined to best suit the characteristics of the metal being welded."

The District Judge was impressed by the "tremendous financial success" of the machines embodying Sciaky's inventions and their impact on the welding industry. He found that the patents had brought something new in welding, namely, the three-phase flux principle the need for which had been recognized for many years in the industry and that since the inventions nothing had been developed to take their place. While commercial success will not validate a void patent, this factor certainly must be considered, particularly in a close case, in determining whether or not there was invention. Aluminum Company of America v. Sperry Products Inc., 285 F.2d 911, 923 (C.A.6), cert. denied 368 U.S. 890, 82 S.Ct. 142, 7 L.Ed.2d 87.

General Electric's customers were pressing it to come out with something to compete with Sciaky's machines. It had nothing which would perform like Sciaky's machines. In 1944 it had built a machine under Livingston '553 patent with an anode transformer, but was unable to sell it. It assigned its engineers to work on the project but they were unable to develop anything. General Electric's Industrial Engineering Division then requested its patent department for permission to use Sciaky's circuit. The General Electric patent department caused a search to be made of the records in the United States Patent Office and elsewhere to ascertain whether Sciaky's inventions were anticipated or disclosed in the prior art. The patent department decided to take the risk and gave its consent to the use of Sciaky's circuit on September 12, 1947 and in the following year the company appropriated funds to build the machines.

In order to induce its customers to purchase these machines, which embodied the principle of Sciaky's inventions, General Electric executed save harmless agreements to indemnify them against loss by reason of patent infringement on account of their use of the machines.

Not only were Sciaky's inventions utilized by General Electric and its customers, but others sought to use them without permission. These included Westinghouse Electric and Manufacturing Company and McGraw Electric Co. Sciaky sued Westinghouse and McGraw in separate actions and at different times for patent infringement. A settlement was made whereby Westinghouse ceased infringing. The McGraw case was settled by a license given to Weltronic Company which defended the case.

The efforts made by these concerns to use Sciaky's inventions are significant as bearing upon their views of the machines' utility.

General Electric contended that all it did was to build a machine which em-

bodied the disclosures of the prior art and that the claims of Sciaky's patents read on the prior art and were invalid for lack of invention.

In building its machines which infringed Sciaky's inventions, General Electric had Sciaky's drawings and used his circuit. It had never built such machines using this circuit before Sciaky's machine was placed on the market. The District Court found that the Sciaky principle was not obvious to technicians skilled in the art and apparently had not been obvious to General Electric's engineers.

At the trial Sciaky's expert Dean Fischer was questioned concerning the claims of each of Sciaky's patents in relation to the prior art and he testified, in substance, that Sciaky's inventions were new and novel and not anticipated or disclosed by the prior art. While the prior art patents relied on by General Electric have varied, the principal one relied on here against '083 was Jonas 1,934,230 entitled "Arcing Frequency Changing System" filed in 1932 and British Patent '868 which was essentially the same as the United States Patent.

The frequency converter is a machine employed by power companies to convert three-phase power to single-phase low frequency alternating current power. It is not a welding machine. Moreover, an essential part of Jonas is an anode transformer which Sciaky eliminates in '083. Jonas does not have separate primary windings to the load transformer for each phase of the supply, but the separate transformer windings are connected to the anode transformer which has a neutral wire. Jonas first makes a direct current which is converted back into an alternating current. The machine does not accumulate flux in the load transformer and could not function as a welding machine.

The District Court distinguished Diamond patent '284 as single-phase machine with an anode transformer which could only be used to weld tin foil or tin cans and nothing heavier. It is a frequency multiplier and cannot accumulate flux.

Patent '708 was not as significant as '803, but did employ a novel manner of controlling three-phase welding. Sciaky sold 100 of his No. 2 machines with an anode transformer and '708 control. The method may also be employed on machines not using an anode transformer. This patent provides a method "whereby any single-impulse welding current or multiple-impulses. are wave shaped to best suit the metal being welded and wherein a balanced load will be drawn from a multiple-phase alternating current supply line." The term "wave shaping" as used by Sciaky "means that a single, unidirectional welding current impulse has its initial or final portions, or both, of substantially different magnitude, so that it can provide preheat or post-heat welding current values, as well as a welding heat current value, in this unbroken unidirectional wave."

The District Court found from the evidence that the prior art did not anticipate or invalidate the claims of '708. In this Court Jonas '230 and Garman '846 are relied on as prior art.

As previously pointed out Jonas is not a method of welding and there was no evidence that it was ever so used. It is a frequency changer.

'708 rectifies an alternating supply current to direct current. Jonas rectifies alternating current output to obtain lower frequency alternating output current.

Claim 3 of '708 varies "the voltage of the direct current applied to the primary winding during each impulse in a controlled manner, whereby the resulting welding current for each impulse produces a controlled heating effect which may be predetermined to best suit the characteristics of the metal to be welded." Jonas has a constant voltage which is applied to the primary windings. Jonas does not change the preheat or post-heat values to suit the weld.

Garman does not rectify an alternating supply current to direct current, but uses alternating current. It does not produce impulses of direct current nor get direct current impulses from the transformer as does Sciaky '708. Garman cannot do the things required by Claim 3 of '708. It does not have controlled heating effect for each impulse. Garman does produce a series of separate impulses which may differ from each other but does not have pulses shaped so as to provide a different heat at the start from that at the finish. '708 gives a heat program from a three-phase power arrangement with a single unbroken output wave that varied as desired in amplitude without going down to zero. Between the pulses of Garman the current goes to zero and heat is lost.

The prior art did not disclose all the elements of Sciaky's combination in '083 and '708 or function in the same way to produce the same result. Sciaky's combination performs a new and useful function. Nor do we believe that Sciaky's principle was obvious to persons skilled in the art. Prior to Sciaky no machine embodying the principles of his inventions had ever been built. In our judgment, the Sciaky inventions were not anticipated or disclosed by the prior art. Firestone v. Aluminum Company of America, 285 F.2d 928, 930 (C.A.6).

In any event, there was substantial evidence to support the findings of fact of the District Court and we do not find that they are clearly erroneous. They are controlling here. Sterling Aluminum Products Co. v. Bohn Aluminum & Brass Co., 298 F.2d 538 (C.A.6.).

In this Court, General Electric has questioned only the validity of the Sciaky patents. Infringement was not an issue.

It follows that the District Court was correct in finding that Claims 1–6 of '083 were valid and infringed, and Claims 3, 6 and 10 of '708 were valid and infringed.

The judgments of the District Court are affirmed in both cases.