RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0341P (6th Cir.)
File Name: 02a0341p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NARTRON CORPORATION,
      *Plaintiff-Appellant,*

      *v.*

STMICROELECTRONICS, INC.,
      *Defendant-Appellee.*

No. 01-1293

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-75607—Anna Diggs Taylor, District Judge.

Argued: August 8, 2002

Decided and Filed: October 1, 2002

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Ernie L. Brooks, BROOKS & KUSHMAN, Southfield, Michigan, for Appellant. Philip J. Kessler, BUTZEL LONG, Detroit, Michigan, for Appellee. **ON BRIEF:** Robert Tuttle, Frank A. Angileri, Pete N. Kiousis, BROOKS & KUSHMAN, Southfield, Michigan, for Appellant. Philip J. Kessler, Laurie J. Michelson, BUTZEL LONG, Detroit, Michigan, James E. Stewart, BUTZEL LONG, Ann Arbor, Michigan, Jane Politz Brandt, Bruce S.

Sostek, THOMPSON & KNIGHT, Dallas, Texas, for Appellee.

––––––––––––––

**OPINION**

––––––––––––––

DAMON J. KEITH, Circuit Judge.  Plaintiff-Appellant, Nartron Corporation ("Nartron" or the "plaintiff"), appeals the district court's grant of summary judgment in favor of the Defendant-Appellee, STMicroelectronics, Inc. ("ST" or the "defendant") on ST's claim of laches and genericness in Nartron's action for trademark infringement.  For the reasons set forth below, we **AFFIRM** the district court's order granting ST's motion for summary judgment on both claims, and dismissing Nartron's complaint alleging federal and state law claims of trademark infringement, dilution, and unfair competition.

## I. BACKGROUND

Nartron is a Michigan corporation with its principal place of business in Reed City, Michigan.  Nartron develops and produces advanced electronic devices including sensors, acoustic devices, displays, controls, harnesses and connectors, lamps, flashers and switches.

ST is a Delaware corporation having a principal place of business in Carrollton, Texas.[1]    ST[2] manufactures and supplies semiconductors or "microchips,"[2] and competes with numerous companies such as Motorola, International Rectifier

––––––––––––––

[1] ST was formed in 1987 as a result of the combination of Thomas Components-Mostek with SGS Semiconductor.  In 1998, ST changed its name from SGS-Thompson Microelectronics, Inc. to STMicroelectronics, Inc.

[2] Semiconductors and microchips are entire electric circuits on a silicon chip, frequently no larger than a dime, which control the flow of electrical current.

limitations period – is "presumptively prejudicial and unreasonable."  Even absent this presumption, which Nartron has failed to rebut, the record evidence sufficiently establishes unreasonable delay and the resulting prejudice.

Finally, we are not persuaded by Nartron's argument that even if its 11-year delay in bringing suits constitutes laches, it is nonetheless entitled to prospective injunctive relief.  Laches only bars damages that occurred before the filing date of the lawsuit.  *Kellogg*, 209 F.3d at 568; *TWM Mfg. Co. Inc. v. Dura Corp.*, 722 F.2d 1261, 1268 (6th Cir. 1984).  It does not prevent plaintiff from obtaining injunctive relief or post-filing damages.  *Kellogg*, 209 F.3d at 568; *TWM* , 722 F.2d at1268.  "[T]o defeat a suit for injunctive relief, a defendant must also prove elements of estoppel which requires more than a showing of mere silence on the part of a plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark."  *SCI Systems, Inc. v. Solidstate Controls, Inc.* 748 F. Supp. 1257, 1261-62 (E.D. Ohio 1990).  Because we conclude that "smart power," as used in connection with ST's product in the semiconductor industry, is generic and thus not entitled to trademark protection, we find that Nartron is not entitled to any prospective injunctive relief.  Therefore, we need not determine whether, based on the record before us, the elements of estoppel exist which suffice to preclude Nartron's claims for post-filing damages or injunctive relief.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting ST's motion for summary judgment on both claims, and dismissing Nartron's complaint alleging federal and state-law claims of trademark infringement, dilution, and unfair competition.

Supp. at 1244. Unavailability of important witnesses, dulling of memories of witnesses, and loss or destruction of relevant evidence all constitute prejudice.

Here, some important witnesses are no longer available, and the memories of other witnesses were, understandably, not as clear as they would have been in the early 1990s. Take Nartron's president, for example. He frequently claimed that his lack of memory prevented him from answering questions. The same was true of Mr. Washeleski, a Nartron employee. Additionally, Nartron's former counsel, who was involved with Nartron's trademark registration and its alleged trademark policing efforts and to whom Nartron's president repeatedly referred, is no longer living. *See Bridgestone/Firestone Research v. Automobile Club*, 245 F.3d 1359, 1362 (Fed Cir. 2001) (one general category of prejudice that may flow from unreasonable delay is "prejudice at trial due to loss of evidence or memory of witnesses"). Lastly, because of the time that has elapsed, the cost of defending Nartron's claim has increased geometrically due, in part, to the amount of material ST has been required to produce in its defense.

As has been Nartron's practice in this case, it completely ignores the unrebutted record that demonstrates the existence of prejudice and instead contends that it should be granted summary judgment because of testimony by Mr. Rossomme ("Rossomme"), ST's Rule 30(b)(6) witness's testimony. Rossomme testified that ST was unaware of Nartron's claims until recently and that "ST's product development and expansion of products of the Smart power group would have proceeded 'Nartron or no Nartron.'" Nartron's use of this testimony misses the point. Rossomme simply confirms that ST would have continued to develop products that utilize integrated circuits that combine logic and power. Had Nartron sued years ago – when it could have – ST would have known whether it could publicly refer to these products generically as utilizing "smart power" technology, or whether some other designation would have to be used. Nartron's remarkably long delay – almost 8 years longer than the

and Siliconix in the semiconductor industry. Over the years, ST has also manufactured products that combine power and intelligence on a single integrated circuit chip.

In April 1978, Nartron began using "Smart power" as a trademark and in 1982, it obtained a federally registered trademark for "Smart power" for "electrical relay assemblies in combination with electrical logic components and parts thereof." In 1986, Nartron broadened the identification of its goods to "electrical power circuits in combination with electrical logic circuits and parts thereof." In 1987, pursuant to 15 U.S.C. § 1065, Nartron filed an affidavit of incontestability with the United States Patent and Trademark Office.[3] Nartron alleges that over the years, it has expended significant time, effort and money advertising and promoting its "Smart power" mark. As a result, Nartron alleges that it has acquired a reputation as a provider of high-quality electrical components in connection with the "Smart power" mark. This, according to Nartron, distinguishes its products from those of its competitors.

In this action for trademark infringement, Nartron alleges that ST made infringing use of its "Smart power" mark on several occasions. First, between 1987 and 1993, Nartron alleges that ST made isolated use of Nartron's "Smart power" mark. Nartron asserts that in August 1987, an ST employee presented a paper entitled *Smart Power Application in Multiple Systems* at a Society of Automotive Engineers ("SAE") show. Nartron further asserts that in October 1990, ST published a manual entitled *Smart Power Application Manual*. Finally, in October 1993, Nartron claims that ST used Nartron's "Smart power" mark in an ST product announcement published in the October 25, 1993, issue of *Electronic Engineering Times*, and in an article published in the October 14, 1993, edition of *Electronic Design*. Second,

---

[3]Under the Lanham Act, 15 U.S.C. § 1065, the filing and acceptance of an affidavit of continuous use for five consecutive years from the date of registration makes the right of the registrant to use the registered mark incontestable, except for certain limited defenses.

Nartron alleges that after 1996, ST ran three advertisements, which Nartron claims used its "Smart power" mark in an infringing manner. Nartron alleges that these ads emphasized the "Smart power" mark, capitalizing or otherwise enhancing the two words. However, unlike previous uses, Nartron alleges that these uses were not isolated.

ST, on the other hand, alleges that it has always made continuous, non-infringing use of the "Smart power" mark. Furthermore, ST claims that it has consistently rejected Nartron's contentions regarding the validity of Nartron's "Smart power" trademark. According to ST, like the rest of the semiconductor industry, ST has only used the term "smart power" to refer generally to technology that combines power transistors and control circuitry on a single integrated circuit. ST alleges that since at least 1988, it has manufactured and marketed products that contain integrated circuits which combine power circuits and logic circuits. ST claims that its VIPower® products are illustrative of products that utilize or embody this "smart power" technology. ST, for example, has described certain of its VIPower® products as follows: "The VIPower® MO process is a vertical *smart power* technology that allows a rugged power stage to be combined with on-chip analog and digital circuitry." *See* J.A. at 883 (emphasis added). ST says that it uses the federally registered trademark VIPower® – as well as its company name – to clearly inform the reader that ST is the source of its VIPower® products. Indeed, claims ST, the ST name and federally-registered ST logo is prominently featured in the advertising, marketing and sales of ST products, including those that fall within the "smart power" category.

After each of ST's uses, which Nartron alleged infringed its trademark, Nartron alleges that it took measures to stop the infringing activity. Nartron claims, contrary to ST's assertions of continuous use, that after each of Nartron's objections, ST ceased use of Nartron's "Smart power" mark. ST disagrees and instead contends that it clearly and unequivocally rejected Nartron's contentions regarding the legality of ST's use of the term "smart power."

321 (6th Cir. 2001) (rejecting plaintiff's claim of progressive encroachment to excuse its delay in bringing suit where defendant's alleged infringing actions in 1990 were no different than its activities in 1994); *Prudential Insurance Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1154-55 (9th Cir. 1982) (declining to apply the doctrine of progressive encroachment where the "marks of the two companies looked as similar twenty-eight years ago as they look today" and defendant did not move into direct competition with plaintiff).

Third, Nartron attempts to rebut the presumption of laches by arguing that ST has suffered no prejudice as a result of Nartron's 11-year delay in bringing suit. The thrust of Nartron's argument, as we best understand it, is that because ST continued with its use of the term "smart power," it must follow that ST has not been prejudiced by Nartron's delay in bringing suit. Nartron, however, fails to appreciate that *any* prejudice is sufficient, including an increase in potential damages or a loss of evidence. S*ee, e.g., Herman Miller*, 270 F.3d at 322 (finding prejudice where potential liability for damages increased); *MCG, Inc. v. Centri-Spray Corp.*, 639 F. Supp. 1238, 1244 (E.D. Mich. 1986) (finding prejudice where evidence to support claim is compromised). A defendant need not "have detrimentally relied on plaintiff's delay for laches to bar plaintiff's monetary claims for past infringement." S*ee, e.g., Herman Miller v. Palazzetti Imports and Exports, Inc.*, 1998 U.S. Dist. Lexis 2743 at *20 (E.D. Mich. 1998), *aff'd in part, rev'd in part*, 270 F.3d 298 (6th Cir. 2001).

The record here demonstrates considerable prejudice to ST. First, because potential damages increase during each year that the claimed mark is used, the nature of Nartron's claims themselves satisfies the requirement that the delay results in prejudice to the defendant. Second, if Nartron had sued in 1990, when it admittedly had notice, the suit could have promptly resolved whether and how ST could use the term "smart power" – long before the print advertisements now challenged were created. Third, the record demonstrates significant evidentiary prejudice. *See MCG, Inc.*, 639 F.

Kellogg's duty to defend its trademark was triggered, and it was from this point that any delay must be measured. *Id.*

Here, by contrast, it is indisputable that ST's use of "smart power" has never changed. ST's use of the mark in 1987 was identical to its uses during the period from 1990 through 1996 and continues to be the same today. ST has always used "smart power" in its generic sense to describe an integrated circuit that combines power and logic on a single chip. Unlike the defendant in *Kellogg*, there was nothing about ST's use of "smart power" in 1995 and 1996 that differed from its earlier uses, such that Nartron's long delay in bringing suit would be excusable. Indeed, Nartron's 1990 cease and desist demand arising out of ST's use of "smart power" in the title of its *Smart Power Application Manual* was no different than Nartron's 1993 and 1994 complaint about ST's use of "smart power" in some of ST's product announcements. We agree with the district court's conclusion that there was no progressive encroachment. "[ST's] activity was the same, exactly the same, and [ST's] refusal to cease was exactly the same for the entire period." *See* J.A. at 1411.

Nartron's argument in support of its contention that ST's use of the mark changed markedly over the period in question is simply without merit. Nartron's assertion that there was a change in management at ST that resulted in ST's markedly different use of the term "smart power" is belied by the record. Furthermore, Nartron's contention that ST used a different type size does not constitute progressive encroachment – nor is it accurate. Both *Smart Power Applications in Multiplex Systems* and ST's *Smart Power Application Manual* capitalized the "s" and "p" – and the manual often referred to "smart power" in all capital letters. Several of the Application Notes used "smart power" in all capital letters. Nor is it uncommon for the industry to use "smart power" in various capitalized letter styles in its purely descriptive sense and not as a designation of a single source. This is far from a case in which ST has "progressively encroached" on Nartron's trademark. S*ee, e.g., Herman Miller v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298,

First, ST notes, and Nartron does not dispute, that with respect to its 1987 use of "smart power," Nartron contacted only SAE, *not* ST. Second, in a letter dated April 23, 1991, in response to Nartron's request that ST cease and desist from its use of its "Smart power" mark, ST responded that due to significant third party use, "smart power" had lost any trademark significance it may have had, and, in any case, no confusion was likely. Consistent with ST's response in this letter, ST claims it continued to use "smart power." In support of its claim of continuous use, ST cites the fact that its *Smart Power Application Manual* was circulated through, at least, 1992. Furthermore, in May of 1993, ST cites the fact that it also presented a VIPower® Application Note[4] at an International Symposium on Power Semiconductor devices that discussed "smart power technologies." As another example of continuous use, ST cites the fact that in January 1994, in response to a December 1993 letter from Nartron's president objecting to ST's use of the term "smart power" in *Electronic Design* (October 14, 1993 edition), ST informed Nartron that its position had not changed from the one expressed in its April 23, 1991 letter. Finally, from 1993 through 1998, ST asserts that it published additional data sheets and application notes referring to "smart power" as well as a VIPower® databook containing hundreds of uses of "smart power" and published ads referring to "smart power."

In 1998, Nartron commenced an action against ST alleging, infringement of its trademark, "Smart power." Nartron filed a complaint in district court alleging that ST had (i) wilfully infringed its federally registered trademark in the mark "Smart power" in violation of 15 U.S.C. §§ 1051-1127; (ii) engaged in unfair competition in violation of 15 U.S.C. § 1125(a); (iii) caused the dilution of the distinctive and valuable quality of the "Smart power" trademark in violation of 15 U.S.C. § 1125(c); and (iv) engaged in unfair competition and trademark infringement in violation of

---

[4]An "Application Note" describes the use and operational characteristics of a particular product.

Michigan common law. The parties were allowed to conduct limited discovery. Thereafter, the defendant moved for summary judgment on, amongst other things, the ground that the term "smart power" is generic and commonly descriptive with respect to its goods, such that the plaintiff is not entitled to prevent the defendant's use of the term. The defendant also sought summary judgment on the ground that the plaintiff's trademark infringement claim, to the extent one did exist, was precluded by laches because of the plaintiff's unreasonable delay in waiting eleven years after first learning of the defendant's use of the term before bringing the present action.

On its second[5] hearing of the parties' summary judgment motions after allowing for additional limited discovery, the district court reversed its earlier rulings on the matter and granted the defendant's motion on both grounds. The district court issued no opinion. At the hearing on the motions, with respect to the issue of genericness, the district court concluded that genericness was undisputed in light of the fact that "ignorance [of the term's genericness in the semiconductor industry] is all the plaintiff offer[ed] the court." *See* J.A. at 1411. Relying on a 150-page chronology produced by the defendant detailing use of the "smart power" term by the semiconductor industry in trade publications, conferences, symposia, advertisements, third party uses, patents, trademarks and copyrights, the district court concluded that "[a] good showing ha[d] been made that Smart Power became a generic term over the 20 years of use in the [semiconductor] industry." *See id.*

The district court also reversed its earlier ruling on the laches issue. With respect to laches, at the hearing, the

---

[5] Nartron initially moved for summary judgment on, *inter alia*, ST's defenses of genericness and laches. ST also cross-moved on both issues. At the first hearing on the parties' summary judgment motions, the district court ruled that there were genuine issues of material fact on whether the mark "Smart power" is generic, but granted summary judgment in Nartron's favor on the issue of laches.

between the period 1987 and 1995, but that ST also clearly and unequivocally, in letters to Nartron, informed Nartron that it refused to refrain from using the mark and that ST would not cease and desist from using the mark.

Second, Nartron posits that even assuming that there was a delay in bringing suit, it is able to overcome the presumption by establishing an excuse for this delay. Nartron argues that ST's use of "smart power" changed markedly, such that the doctrine of "progressive encroachment" excuses Nartron's failure to commence suit earlier. Recently, in *Kellogg Company v. Exxon Corporation*, 209 F.3d 562 (6th Cir. 2000), we explained that progressive encroachment "allows the plaintiff to demonstrate that although it might have been justified in bringing suit earlier but did not, certain factors now exist that have prompted it to do so." *Id.* at 571. Progressive encroachment requires something about the defendant's use of the mark to have changed significantly. *Id.* at 573. The court in *Kellogg* analyzed cases in which the defendant made certain changes to the appearance of its mark, expanded its marketing efforts, or entered into new areas of business that directly competed with the trademark owner. *Id.* at 571-73.

In *Kellogg*, the plaintiff, Kellogg, owned the "Tony The Tiger" trademarks for breakfast cereal since 1952. *Id.* at 564. In 1965, Exxon registered its "Whimsical Tiger" trademark -- with no opposition from Kellogg -- for use in the promotion of petroleum products, a product and market with which Kellogg had no connection. *Id.* at 565. Kellogg delayed in suing for 31 years, until Exxon began using its "Whimsical Tiger" in connection with its convenience stores. *Id.* at 573. We held that there was an issue of fact as to whether Kellogg was justified in waiting to sue until Exxon expanded its use of its Whimsical Tiger into the food business. *Id.* at 574. In reaching this conclusion, we explained that for purposes of determining laches or acquiescence, the point at which Exxon established itself in the non-petroleum market was the point at which Kellogg knew or should have known that it now had a provable claim for infringement; it was at this point that

unreasonable. In order to overcome the presumption of laches, plaintiff must: (1) rebut the presumption of prejudice; (2) establish that there was a good excuse for its delay; or (3) show that the defendant engaged in "particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Dana Corp*, 674 F. Supp. at 583 (quoting *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349 (6th Cir. 1979)). First, Nartron attempts to rebut the presumption of laches by arguing that there was no delay in bringing suit. Second, Nartron argues that even if there was a delay, the doctrine of "progressive encroachment" excuses its delay in bringing suit, because ST's use of "smart power" changed markedly from 1987 until the time Nartron commenced its lawsuit in 1998. Third, Nartron argues that ST suffered no prejudice as a result of Nartron's unreasonable delay in bringing suit. Finally, Nartron contends that even if its 11-year delay in bringing suit constitutes laches, it is nonetheless entitled to prospective injunctive relief. We are not persuaded by any of Nartron's arguments.

First, in attempting to overcome the presumption, Nartron takes issue with the conclusion that there was an unreasonable delay in commencing its trademark action. According to Nartron, there is a question of fact as to whether the laches period started before November 13, 1995,[11] and therefore seeks to conclude that there is a genuine issue of material fact as to the unreasonableness of the delay in commencing suit. Nartron argues that it had no reason to sue earlier, because ST did not begin continuous infringing use of the "Smart power" mark until 1996. In support of this contention, Nartron claims that ST only used "smart power" three times between 1987 and 1995. Furthermore, according to Nartron, on each such occasion, it wrote to ST to complain about ST's use of "smart power." In return, claims Nartron, ST acquiesced and stopped using the mark. The record, however, adequately establishes that ST not only made significantly more than three uses

---

[11]Nartron commenced this suit on November 13, 1998. November 13, 1995, is the date three years before the suit was commenced.

district court stated that "[the defendant's] eleven years of constant use of the term Smart Power, [a] total rejection of every request to stop, . . . [a]nd the [] obviously unchanged attitude of the defendant concerning its right to use this term which it considered generic, all required that the Court impose the doctrine of laches here." *See* J.A. at 1410. The district court also concluded that "[s]ubstantial prejudice has occurred in the eleven years it's [sic] taken to [sic] for the lawsuit to be filed." *See id.* Rejecting Nartron's progressive encroachment argument to excuse its unreasonable delay in filing suit, the district court concluded that the "reason given for the filing of the lawsuit . . . does not hold water. There was no new and more intransigent management. Intransigency was the same as it had been for all eleven years. The management was the same, but the initials of two names were combined." *See id.*

The district court, however, declined to rule on ST's additional affirmative defenses of "fair use" and likelihood of confusion.[6] The plaintiff now appeals, arguing that, with respect to the issues of genericness and laches, the district court's grant of summary judgment in the defendant's favor was incorrect because the district court improperly drew inferences in ST's favor, and weighed evidence in arriving at its decisions on these issues.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Daddy's Junky Music Stores v. Big Daddy's Family Music Center*, 109 F.3d 275, 280, (6th Cir. 1997); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir.), *cert. denied*, 121 S.Ct. 340 (2000). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 250

---

[6]We too find it unnecessary to express any opinion as to the merits of these other additional affirmative defenses.

(6th Cir. 1994). We consider all facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). Nevertheless, the mere scintilla of evidence in support of the non-movant's position is not sufficient to create a genuine issue of material fact. *Id.* The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.*

**a. Genericness**

The district court correctly granted summary judgment in favor of ST on the issue of genericness of the term "smart power" as used in the semiconductor industry in connection with ST's products, including ST's VIPower® line of products. In opposing ST's summary judgment motion on the issue of genericness, Nartron failed to present evidence demonstrating any genuine issues of material fact. A generic term can never function as a trademark. *See, e.g., Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 994 (7th Cir. 1979), *cert. denied*, 444 U.S. 1102 (1980). On the other hand a term that is "merely descriptive" may be used as a trademark if it has acquired a secondary meaning.[7]   Thus, in considering

---

[7] Generic terms are also called "common descriptive" terms, as distinguished from "merely descriptive" terms. *See,* e.g., *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193-94 (1985); *compare* 15 U.S.C. § 1052(e), (f) (a "merely descriptive" term may be registered if it has "become distinctive of the applicant's goods in commerce") *with id.* § 1064 (c) (registration may be cancelled if the mark has become "the common descriptive name of an article"). A "merely descriptive" mark, as opposed to a "common descriptive" one, is often said to identify a characteristic of the thing. It is very similar to an adjective. Judge Friendly illustrated the distinction between a generic and a merely descriptive mark with the "Deep Bowl Spoon" example:

---

*Applications Manual* (1st Ed.). This extensive manual contained Application Notes describing ST's products that utilized "smart power" technology. The manual, which was in circulation from 1989 through 1992, uses the term "smart power" throughout. Nartron did not write to ST about the 1989 manual until 1990.

In its defense, Nartron argues that ST's use of "smart power" between 1987 and October 1993 was isolated and no use occurred between October 1993 and 1996. Nartron further argues that it delayed filing suit until 1998 because it believed ST had stopped its prior uses after notification from Nartron to cease such use. We disagree.

The record demonstrates that Nartron had actual or constructive notice of ST's use, at least by 1990. Furthermore, Nartron's contention that ST made no use of "smart power" in 1988, 1989, 1991, 1992, 1994 and 1995 is unsupportable and contrary to the record. It is clear from the record that ST continued to circulate its *Smart Power Application Manual* in 1991 and 1992. It is also clear from the record that between 1988 and 1995, ST made numerous other uses of the term aside from those in connection with the *Smart Power Application Manual*.

Equally unsupportable and directly contradicted by the record is Nartron's suggestion that ST acquiesced in Nartron's requests to cease its use of the term "smart power." Not only did ST continuously use "smart power," it repeatedly informed Nartron that it had no intention of stopping its use. As such, Nartron could not reasonably have believed that ST acquiesced in its request to cease and desist from using the mark or that ST had in fact stopped using the mark. Accordingly, ST has shown that Nartron filed suit significantly more than three years after it knew, or should have known, of the alleged infringement. This delay is presumptively prejudicial and unreasonable, creating a rebuttable presumption of laches.

Nartron is unable to rebut the presumption that its significant delay in bringing this suit was both prejudicial and

applicability of the doctrine of "progressive encroachment"; and (iv) ST failed to demonstrate that it suffered any prejudice.

We too conclude that the doctrine of laches precludes Nartron's claims for trademark infringement. Laches is the "negligent and unintentional failure to protect one's rights." *Elvis Presley Enter., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991). A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. *See Induct- O-Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 367 (6th Cir.1984). In this Circuit, there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed. *Elvisly Yours*, 936 F.2d at 894. In evaluating whether a party has been diligent in protecting its trademark, we look to the state-law statute of limitations for injury to personal property. *Id.* Here, under Michigan law, that period is three years. *See* M.C.L.A. § 600.5805(8); *Elvisly Yours*, 936 F.2d at 894. In other words, a delay beyond the three-year statutory period is presumptively prejudicial and unreasonable. The period of delay begins to run when plaintiff had "actual or constructive knowledge of the alleged infringing activity." *Dana Corp. v. IPC Ltd. Partnership*, 674 F. Supp. 581, 583 (E.D. Mich. 1987) (citing *General Elec. Co. v. Sciaky Bros., Inc.*, 304 F.2d 724 (6th Cir. 1962)).

In this case, ST argues that Nartron was aware of ST's use of "smart power" as early as 1987 or, at the latest, 1990. In 1987, ST used the mark in connection with materials presented at a Society of Automotive Engineers ("SAE") Conference and Exposition on Future Transportation. At the conference, an ST employee presented a paper titled *Smart Power Applications in Multiplex Systems.* The record demonstrates that Nartron was aware of this use, but Nartron's only response was to send a letter to SAE, *not* ST. Nartron does not dispute that it never contacted ST with respect to ST's use of the term at the 1987 SAE conference. Subsequently, in June 1989, ST published its *Smart Power*

Nartron's challenge of ST's use of "smart power" as used in connection with ST's products in the semiconductor industry, including ST's VIPower® line of products, the crucial question is whether there is a genuine issue of material fact as to whether the term is a generic (i.e., common descriptive) or "merely descriptive" term. The district court held that, as used by the defendant in the semiconductor industry, the term "smart power" is a generic term because it defines a type of technology that the defendants and others in the semiconductor industry develop and market.

We agree with the district court that "smart power," as used by ST in connection with its VIPower® line of products, has become a generic term in the semiconductor industry. "A generic term is one that is commonly used as the name of a kind of goods . . . . Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986) (citations omitted); *see also Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996). If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark. *See, e.g., Bath & Body Works*, 76 F.3d at 748; *Liquid Controls Corp.*, 802 F.2d at 939. Thus, the

---

"Deep Bowl" identifies a significant characteristic of the article. It is "merely descriptive" of the goods, because it informs one that they are deep in the bowl portion . . . . It is not, however, "the common descriptive name" of the article (since) the implement is not a deep bowl, it is a spoon. . . . "Spoon" is not merely descriptive of the article, it identifies – the article - (and therefore) the term is generic.

*See Abercrombie & Fitch Co. v. Hunting World, Inc.* 537 F.2d 4, 10, n.11 (2d. Cir. 1976), quoting Fletcher, *Actual Confusion as to Incontestability of Descriptive Marks*, 64 Trademark Rep. 252, 260 (1974). Where a mark registered on the federal principal registry is "merely descriptive" and has become incontestable pursuant to 15 U.S.C. § 1065, the mark is presumed to have acquired a secondary meaning. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934,936 (7th Cir. 1986).

appropriate "test for genericness is whether the [relevant] public perceives the term primarily as the designation of the article." *Blinded Veterans Association v. Blinded Veterans Foundation*, 872 F.2d 1035, 1041 (D.C. Cir. 1989). To allow protection for generic terms would grant "a monopoly, since a competitor could not describe his goods as what they are." *CES Publ'g Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975); *see also Nestle Co. v. Chester's Market, Inc.*, 571 F. Supp. 763, 766 ( D.Conn. 1983), *vacated*, 756 F.2d 286 (2d Cir. 1985). Thus, there can be no infringement if the primary significance of "smart power" as used by ST is to describe a type of product, here a type of technology, and *not* to identify the source of such products.[8]

Here, on its summary judgment motion for genericness, ST sufficiently carried its burden of demonstrating the absence of any genuine issue of material fact on its claim of genericness. ST produced overwhelming evidence, which Nartron failed to rebut, that the term "smart power," as used by ST and other participants in the semiconductor industry, denotes a type of technology, *not* goods associated with Nartron. We are not convinced by Nartron's argument that the district court improperly applied the summary judgment standard. Nor are we persuaded by Nartron's specious arguments that there remain genuine issues of material fact which should have precluded the district court's grant of ST's summary judgment motion.

We note initially that Nartron makes too much of the fact that its mark, pursuant to 15 U.S.C § 1065, had become

---

[8]Many technology related terms have been found to be generic. *See, e.g., In re Gould Paper Corp.*, 834 F.2d 1017, 1019 (Fed. Cir. 1987) ("screenwipe" for screen cleaning cloth); *Reese Publ'g Co. v. Hampton Int'l Communications, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) ("video buyer's guide" for video guides); *Holographic Designs Sys. v. Holographic Design, Inc.*, 1987 WL 27374 (N.D. Ill. 1987) ("holographic design" for design of holographic goods); *Liquid Controls*, 802 F.2d at 938 ("liquid controls" generic for meters for controlling the flow of liquid); *Surgicenters of Am., Inc., v. Dental Surgeries Co.*, 601 F.2d 1011, 1018 (9th Cir. 1979) ("surgicenter" generic for surgical centers).

on genericness and the district court could not properly give greater weight to ST's evidence than Nartron's evidence.

Nartron fails to appreciate the distinction between "common descriptive" terms and terms considered "merely descriptive."[10] Some terms on ST's list, for example "smart power management," suggest that "smart power" was being used descriptively. The majority of the examples, however, clearly demonstrate that, as used in the semiconductor industry, "smart power" was used as the designation of the article itself – here, a wide range of products and technologies all of which implement the function of interfacing logic circuits to power loads.

## b. Laches

The district court correctly granted summary judgment in favor of ST on the issue of laches. We are not persuaded by Nartron's argument that the district court improperly applied the summary judgment standard on this issue. In arriving at this decision, the district court concluded that Nartron failed to rebut ST's evidence demonstrating that, for eleven years, ST had constantly and continuously used the term "smart power," and totally rejected every one of Nartron's requests to stop using the term. In addition, in light of Nartron's inability to justify its delay in bringing suit, the district court surmised that substantial prejudice had occurred in the eleven years that it took for Nartron to bring suit. On appeal, Nartron argues that the district court weighed evidence and improperly drew inferences in ST's favor. In support of its arguments, Nartron asserts the following: (i) ST's use of "smart power" between 1987 and October 1993 was isolated and no use occurred between October 1993 and 1996; (ii) Nartron submitted evidence that Nartron delayed filing suit because Nartron believed ST had stopped its prior uses after Nartron requested that ST cease using the mark; (iii) ST's use of "smart power" grew from trivial to significant, hence the

---

[10]*See supra* note 7 discussing the difference between "merely descriptive" and generic (i.e. common descriptive) terms.

suggesting that there is a genuine issue of material fact with respect to the issue of genericness.[9]

Also, Nartron's reliance on ST's failure to provide any dictionary containing a definition for "smart power" is misplaced. Dictionary definitions are merely one source from which genericness may be proven. The law is quite clear that the absence of a composite term from the dictionary does not end the analysis, because numerous terms have been found to be generic despite their absence from the dictionary. *See, e.g., Liquid Controls*, 802 F.2d at 937 (holding that "liquid controls" is generic); *National Conf. of Bar Examiners*, 692 F.2d at 487-88 (holding that "multistate bar examination" generic); *Technical Publishing Co.*, 729 F.2d at 1139 (finding that "software news" probably generic); *Miller Brewing Co. v. G. Heileman Brewing Co.,* 56 F.2d 75 (7th Cir. 1977) (holding that "light beer" is generic), *cert. denied*, 434 U.S. 1025 (1978). On the other hand, ST argues that the composite term "smart power" is nothing more than the composite of its parts – "smart" and "power" – and thus like "liquid control," " multistate bar examinations," and "light beer," "smart power" too must also be deemed generic. We need not decide the merits of ST's argument, because it has introduced other evidence tending to show that "smart power" is a generic term.

Finally, we are not convinced by Nartron's argument that the district court erred in relying on ST's evidence showing the widespread use of "smart power" as a generic term. According to Nartron, ST prevailed by overwhelming the district court with a great number of alleged uses of the term "smart power" in various areas. This proof, claims Nartron, goes only to descriptiveness, not genericness, because the uses in ST's list are descriptive, not generic. At most, concludes Nartron, ST's list creates an issue of material fact

[9] Other than the testimony of its president, Nartron does not provide any evidence suggesting that the relevant public, here market participants in the semiconductor industry, perceive "smart power" as being associated with Nartron's products.

"incontestable." According to Nartron, this means, *inter alia,* the mark "must be considered strong and worthy of full protection," *see Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988), and that it cannot be challenged on the basis of being merely descriptive. The mark's incontestable status, however, does not protect it from a challenge, as here, premised on a claim that it has become generic. *See* 15 U.S.C. § 1065. Nevertheless, because the mark at issue was a federally registered mark, there is a presumption that the term is non-generic and the defendant bears the burden of overcoming this presumption. *Bath & Body Works*, 76 F.3d at 748 (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 12.02[7][b] (3d ed. 1992) ), renumbered as § 12.12 (4th ed.1996)). In addition to demonstrating the absence of any genuine issue of material fact on its claim of genericness, ST also produced evidence sufficient to overcome whatever presumption of nongenericness Nartron was entitled to on account of its ownership of an incontestable federally registered trademark. We reject Nartron's arguments urging that we reach a contrary conclusion.

Nartron argues that the district court's grant of summary judgment in the defendant's favor was incorrect because the district court improperly made inferences in favor of ST, and improperly weighed evidence in concluding that the term was generic. In support of its argument, Nartron asserts that ST (i) submitted no evidence, survey or otherwise, establishing that the public perceives Nartron's "Smart power" mark as primarily the designation of an article; and (ii) provided no dictionary evidence to counter Nartron's submission of six technical dictionaries, none of which contained a definition for "smart power" or "smartpower." Nartron's arguments are without merit.

The district court did not err in concluding that, as a matter of law, "smart power" had become generic in the semiconductor industry. Nartron's assertion that "ST submitted no evidence that 'the public perceives the SMART-POWER mark primarily as the designation of the article' at

issue," is simply not supported by the record.  Ordinarily, it is a term's meaning to consumers, not professionals in the trade, that is the test of genericness and descriptiveness for ordinary consumer goods.  *See*, e.g., *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991); *Anheuser-Busch, Inc., v. Stroh Brewery Co.*, 750 F.2d 631, 638 (8th Cir. 1984). However, the 1984 "Anti-Monopoly" amendments to the Lanham Act require that "[t]he primary significance of the registered mark to the *relevant public . . .* shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used."  *See* Lanham Act § 14(3), 15 U.S.C. § 1064(3) (emphasis added).  "The relevant public" is a broad term that implies that in an appropriate case it could include professional buyers.  *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 12.5 (4th ed.1996).  Public, in this context, does not necessarily always mean everyone.  *Id.* Rather "relevant public" could be composed of a relatively small group of highly trained and knowledgeable professional customers for a particular specialized product or service.  *Id.* Here, the record before us is replete with evidence submitted by ST in support of its claim that "smart power," as used in connection with its VIPower® line of products, is perceived as a generic term by participants in the semiconductor industry including manufacturers, customers, suppliers, vendors and the trade and technical press.

We agree with the district court that ST produced enough evidence to overcome the presumption of nongenericness.  In deciding genericness, evidence of the relevant public's understanding of a term "may be obtained from *any competent source.*"  *In re Merrill, Lynch, Pierce Fenner & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed. Cir. 1987) (emphasis added).  Thus, ST may properly show that "Smart power" is generic with evidence such as dictionary definitions, newspapers and other publications, generic use by competitors, generic use of the term by the mark's owners, and use of the term by third parties in trademark registrations. *Abercrombie & Fitch Co., v. Hunting World, Inc.,* 537 F.2d 4, 12 (2d Cir. 1976); *In re Northland Aluminum Prod.,* 777 F.2d

1556, 1559 (Fed Cir. 1985); *Tektronix, Inc., v. Daktronics, Inc.*, 534 F.2d 915, 916-17 (C.C.P.A. 1976); *see also Frito-Lay, Inc. v. Bachman Co.*, 704 F. Supp. 432, 440 (S.D.N.Y. 1989).  ST did just that.

Here, ST provided undisputed deposition testimony from third-party participants in the semiconductor industry, including manufacturers and distributors.  They provided testimony that manufacturers, customers, suppliers, vendors, and others in the semiconductor industry, including the trade and technical press, use the term "smart power" generically to mean power devices that have control circuits.  In addition to unrefuted admissions by professionals in the semiconductor industry that "smart power" is generic, ST also prepared a 150-page chronology from 1982 through the present that digested the pervasive uses of "smart power" to identify devices that utilize a certain type of technology, particularly integrated circuits that combine both power and logic.  This chronology provided evidence from a variety of sources including trade journals, newspapers and other publications, and advertisements.  In addition, the chronology also set forth evidence from patent, trademark and copyright registrations indicating that even the United States Patent and Trademark Office and the United States Copyright Office have come to recognize the term as signifying a type of technology in the semiconductor industry.  Thus, the overwhelming evidence in this case obviates the need for ST to have conducted a consumer survey.  *See, e.g., Liquid Controls*, 802 F.2d 934 at 941 (district court's grant of summary judgment on issue of genericness without survey affirmed by appellate court)*; see also Barrios v. American Thermal Instruments, Inc.*, 712 F. Supp. 611, 614 (S.D. Ohio 1988) (consumer survey not necessary and "dictionaries, newspapers, and other publications may be used to establish that a term is generic"); *Suh v. Yang*, 987 F. Supp. 783, 791, n.4 (N.D. Cal. 1997) (surveys "de rigeur," but not required; summary judgment without survey granted); *Exponconsul International, Inc., v. A/E Systems, Inc.,* 755 F. Supp 1237, 1247 (S.D.N.Y. 1991) (same).  This result is compelled where Nartron has failed to rebut the proffered evidence, nor provided evidence of its own